873 A.2d 1233

**Orlando BYNDLOSS**

v.

**STATE of Maryland.**

**No. 711, Sept. Term, 2004.**

Court of Special Appeals of Maryland.

May 5, 2005.

288

Amy E. Brennan (Nancy S. Forster, Public Defender, on brief), for appellant.

Shannon E. Avery (J. Joseph Curran, Jr., Atty. Gen., on brief), for appellee.

Panel DAVIS, EYLER, D. S., THEODORE G. BLOOM (retired, specially assigned), JJ.

DAVIS, J.

Appellant, Orlando Byndloss, was charged in the Circuit Court for Prince George's County with importation of 28 or more grams of cocaine, possession of 448 or more grams of cocaine with intent to distribute, possession of cocaine with intent to distribute, conspiracy to distribute cocaine, and possession of cocaine. His motion to suppress was heard and denied (Krauser, J. presiding) on March 19, 2004. He was

subsequently tried and convicted at a bench trial (Lamasney, J. presiding) and sentenced as follows: 15 years for count one—importation of cocaine; a concurrent 15 year sentence, the first five years without the possibility of parole, for count two—possession of 448 grams or more of cocaine with intent to distribute; count three—possession of cocaine with intent to distribute and count five—possession of cocaine, were merged with count two for purposes of sentencing. From these convictions and sentences, appellant appeals and presents the following question for our review:

Did the motions court err in denying appellant's motion to suppress evidence seized from a suitcase in the trunk of a car in which he was a passenger?

We answer in the negative. Accordingly, we shall affirm the judgment of the lower court.

## FACTUAL BACKGROUND

## MOTION TO SUPPRESS

Sergeant Clifford Hughes, a ten-year veteran of the Special Operations Section of the Interstate Criminal Enforcement Team of the Maryland State Police, and a former police officer in Virginia from 1992–1994, testified that the primary duties of the criminal enforcement team were traffic enforcement on Maryland interstate roads and interception of the bulk shipment of drugs, untaxed cigarettes, currency, illegal weapons, and contraband, as well as identifying potential interstate terrorists. Through "aggressive, proactive traffic enforcement," maintained the witness, the Team "look[ed] for violations, traffic violations." Sergeant Hughes elaborated:

We do what we call the complete traffic stop process. We identify the operator and/or passengers in the vehicle, we look for anything basically out of place, indicate if there is criminal activity, whether it be nervousness or any other things that you don't see in a normal traffic stop, and just follow through with it.

At approximately 10:58 a.m. on November 19, 2003, Sergeant Hughes observed a 1997 Green Chevrolet Malibu with Florida registration plates preceding Northbound on I–95 at Route 198 in Prince George's County. As Sergeant Hughes followed the green Malibu, he observed that the vehicle registration "tags and month were not visible at all" because of a plastic cover over them. After pulling the vehicle over[1] because of this violation,[2] he immediately notified the communications operator at the College Park barrack, at 10:58 a.m., who advised him that the information requested regarding the driver's license of appellant and the driver, Joan Malone, and vehicle registration, were not available, because the MILES and NCIC computer systems were down. The dispatcher was also unable to say when the systems would be up and running again.

To avoid being struck by vehicles on Interstate 95, Sergeant Hughes had approached the passenger side of the vehicle and signaled for appellant to roll down his window at 10:59 a.m. After advising appellant and Malone that the traffic stop was being videotaped, the officer had asked Malone for her driver's license and registration, explaining that she had been stopped because her license plate cover obstructed the view of her license tag. According to Sergeant Hughes, Malone's hands were shaking, her voice was "shaky," and "she seemed extremely nervous and she was very restless" as she handed him her license and registration. When asked where she was going and from where she was coming, Malone responded that she was coming from Florida on her way to New York City.

At 11:02 a.m., Sergeant Hughes returned to his vehicle with Malone's and appellant's driver's licenses and the car registration, but, because the information system was not in service, he began to write a warning ticket. Sergeant Hughes further testified that he told the other officer "I'm going to talk to

---

1. A second State Trooper in a separate vehicle also pulled over to assist with the stop.

2. Md.Code (1999 Repl.Vol., 2001 Supp.), Trans., § 13–411.

them a little more, she is real nervous." A K–9 unit was also called at this juncture. Six minutes later, at 11:08 a.m., Sergeant Hughes again called the College Park barrack and was informed that the system was still not operational. Having been unable to check for outstanding warrants or other infractions, Sergeant Hughes did not give Malone the written warning because he had been unable to "run" her license and registration information.

Advised by the College Park barrack dispatcher that it was only that system that was down, Sergeant Hughes, at 11:09 a.m., contacted the Waterloo barrack dispatcher, but had to call back at 11:10 a.m. because of background noise during his initial call. After being assured that the Waterloo dispatcher would relay the results of the requested background check once he received the information, Sergeant Hughes advised Malone that he was waiting for the results of the license and warrant check and that she would be free to go as soon as they were received. Sergeant Hughes then asked Malone to step outside of the vehicle and again asked her where she was going and reminded her that she was free to leave once the computer system relayed the information he required. Sergeant Hughes testified:

> She told me she was going to New Jersey, and she had previously told me she was going to New York. I asked her did she have a lot of luggage in the vehicle and she said no. She had previously told me she was going to stay a week, and I asked her how was she going to stay a week without a lot of luggage, and she stated she wasn't going to stay a week because she had to go back to work. Her stories were inconsistent with what she had previously stated to me and at that time, I also noticed that her eyes were watering and she appeared to be crying. She was jumpy. She couldn't keep still and she was holding herself.

The College Park dispatcher called Sergeant Hughes at 11:19 a.m. to advise that Trooper First Class Butler, assigned to the K–9 Unit and who had been summoned by Sergeant Hughes at 11:02 a.m., was unable to find his location. After again attempting to obtain results of the warrant check from

the Waterloo barrack and having been told to "stand by," Sergeant Hughes, in a conversation which took place in his departmental vehicle after Malone voluntarily entered, asked whether there were "any weapons, narcotics, or untaxed cigarettes, contraband, currency, et cetera, in the vehicle, and she said no. And I asked her was she sure and she said not that I know of."

At 11:23 a.m., despite complaining to the communications officer at the Waterloo barrack that the background check was taking a long time, Sergeant Hughes was still unable to obtain the information requested, as the officer said he was "really busy." At 11:26 a.m., TFC Butler arrived and began the scan of the car. At 11:27 a.m., the communications operator at the Waterloo barrack called to inform that appellant had an extensive criminal background, but that no information was yet available as to Malone. "At the same time," testified Sergeant Hughes, "TFC Butler is running the dog around the vehicle, I observed the dog to the right-rear side of the vehicle, which I knew was a positive sit alert for the presence of narcotics."

Based on the dog's alert, the vehicle was searched from 11:30 a.m. until 11:40 a.m. Two kilos of suspected cocaine were found in a suitcase in the trunk of the car. The communications operator at the Waterloo barrack never called back with information about Malone. After the pair was arrested, Sergeant Hughes went to the College Park barrack, where he obtained the background information on Malone.

Upon consideration of the above testimony, the lower court issued the following ruling:

Thank you very much. With all due respect, my off-the-record comment while watching a rather boring videotape, I can only suggest that there is a very real difference in watching a videotape where for 20 minutes basically nothing was happening and having the experience of that 20 minutes in real-time in real life. Be that as it may, I'm sure that those 20 minutes of waiting seemed like an eternity to the

defendants, and that is why the issue of timing is something that the appellate courts scrutinize very carefully.

In this instance, we have a confluence of misfortune on behalf of the defendants and poor timing on the part of the State in which the trooper, through absolutely no fault of his own, was stuck with a K–9 officer that he called for at 11:02, who apparently got lost, and said he couldn't find the trooper, who was clearly visible on the side of the road, but apparently on the opposite side of the six—or eight-lane highway from where the K–9 officer was looking for him.

And you had that, plus the fact that his home barracks in College Park had its computer down. And clearly until the second call that the trooper made, he could not be certain whether it was the entire NCIC or MILES system and its connection to the state police or whether it was only the local computers at College Park, which it turned out to be.

He was directed at College Park to call either Frederick or Rockville—Forestville or Rockville, which might have made sense if you're sitting in College Park and you know that College Park is halfway between those two locations, but, in fact, the trooper was on I–95 in the northbound lanes at or near the intersection with the Route 198 cut-off, and he knew that from the 198 exit, the Waterloo barracks is only a couple miles down the road, whereas Rockville was 20 miles away.

Learn your geography and you'll know the answer to that. I happen to know that, having driven it many times. And I think there is an old case from Judge Chasanow that says I'm allowed to take judicial notice of local geography. Because apparently you all don't know how to figure those things out. But anyway, that's the reality.

Forestville was probably much farther than Rockville. Rockville was certainly much farther than Waterloo, which was the next barracks closer to College Park. What the trooper didn't anticipate was that making that call for the records check was going to hit at the same time that apparently the Waterloo barracks was inundated either with

an inefficient dispatcher or somebody who was inundated with a lot of calls coming in at just that particular time.

So he was waiting in good faith for the records check to come back. I believe that I was wrong, and while I could appreciate your not wanting to correct me, but I frankly didn't remember what the finding was in *Wilkes*, and the *Wilkes* case clearly says that a K–9 sniffing on the exterior of a vehicle or even a suitcase does not create any Fourth Amendment issue whatsoever because the K–9 does not intrude into anything, and we saw that plainly on the video.

So the length of time that it happened to take for both the K–9 and the records check were almost exactly and precisely concurrent. The records check, I believe, call came back while the dog was wandering around the vehicle, if I recall. If not, it was within a minute or so of the dog arriving and going around the vehicle. I observed the dog. I saw him stop twice, sniffing where it appeared to me that the defendant was seated on the passenger side of the vehicle.

Again, as I said earlier, you can't tell on a two-dimensional video what the distance is from the rear of the vehicle to the passenger door, but that was the area in which I saw him kind of sniff a little bit and then get pulled away by the handler to move on and go around the vehicle again. But he did that on each of the first two circuits and it was only on the third circuit that he came around and actually sat. But he was sitting on the same side of the vehicle that he had sniffed before. So I couldn't tell whether he was sniffing at the front passenger door or right behind that or closer to the rear of the vehicle on the side of the trunk by the rear door.

Clearly, the officers who reported believed that the dog was indicating at the rear of the passenger compartment. They checked there to no avail. I watched the video and you could see the trooper actually reach deep into the trunk to pull some piece of luggage, or whatever it was, to the front of the trunk in order to then search it. So whether it was in that area just above the wheel well, which would have been approximately where the dog was indicating, is

really something for conjecture because I don't think that video is going to get any clearer no matter how many times you watch it.

So you're going to have to wait for that, for the testimony of the handler as to where he was indicating. But I'm satisfied that there was enough at that indication to become then probable cause for a full search of the vehicle, passenger compartment and trunk.

Now, as to the delay, I find no impermissible delay because it was absolutely not a pretext for the officer to be waiting for a call back to confirm whether or not there were outstanding warrants or any illegality in the licensing of the driver. While it appears at first blush that because he was able to very quickly clear up any confusion by the registration plate obscuring date—or month and year, he cleared that up, apparently, very quickly with the driver's license and registration card, but at the time that he was able to look at that, he was also calling in the information for outstanding warrant and criminal record check, which is routine procedure.

The delay was caused through no fault of the officer. It was not a pretext. Granted he did try and do some more investigative work while talking pre-arrest with the defendant Malone, but all that established was some inconsistencies in what she had told him that raised his suspicions. In fact, he had already requested K–9 assistance. So those reasonable suspicions certainly didn't go to his effort to get a K–9 officer out there because he had already made that decision. So I find those to be irrelevant to this finding.

But I don't see anything other than due diligence in the officer's part in making the stop.

## TRIAL

At the bench trial, Sergeant Hughes testified, as he had on the motion to suppress, that the dog alerted him to the presence of narcotics, whereupon he ordered appellant out of the car and conducted a search of the vehicle. Inside a black

suitcase in the trunk of the car were articles of men's clothing inside of which was a "Family Dollar bag" inside of which were too flat packages wrapped in yellowish, brownish masking tape. Inside the packages was a white powder, suspected to be cocaine or heroin.

Sergeant Hughes transported the taped packages to the police barrack in College Park and, after removing the masking tape from the two packages, weighed them. The total weight of the two packages was 2,124.4 grams and the weight of the 10 samples which were sent for analysis to the chemist was 15.1 grams; he confirmed the substances in the packages were cocaine.

## STANDARD OF REVIEW

Our review of the circuit court's denial of a motion to suppress evidence under the Fourth Amendment is limited, ordinarily, to information contained in the record of the suppression hearing and not the record of the trial. *Dashiell v. State,* 374 Md. 85, 93, 821 A.2d 372 (2003); *Riddick v. State,* 319 Md. 180, 183, 571 A.2d 1239 (1990); *State v. Carroll,* 383 Md. 438, 445, 859 A.2d 1138 (2004); *Rowe v. State,* 363 Md. 424, 431, 769 A.2d 879 (2001); *Ferris v. State,* 355 Md. 356, 368, 735 A.2d 491 (1999). When there is a denial of a motion to suppress, we are further limited to considering facts in the light most favorable to the State as the prevailing party on the motion. *Ferris,* 355 Md. at 368, 735 A.2d 491; *Graham v. State,* 146 Md.App. 327, 341, 807 A.2d 75 (2002). In considering the evidence presented at the suppression hearing, we extend great deference to the fact-finding of the suppression hearing judge with respect to the weighing and determining [of] first-level facts. *Lancaster v. State,* 86 Md.App. 74, 95, 585 A.2d 274 (1991); *Perkins v. State,* 83 Md.App. 341, 346, 574 A.2d 356 (1990). When conflicting evidence is presented, we accept the facts found by the hearing judge unless it is shown that his/her findings are clearly erroneous. *McMillian v. State,* 325 Md. 272, 281–82, 600 A.2d 430; *Riddick,* 319 Md. at 183, 571 A.2d 1239. Unless clearly erroneous, we also accept the trial court's conclusions regarding witness credibili-

ty. *Dashiell v. State,* 374 Md. 85, 93, 821 A.2d 372 (2003); *Riddick v. State,* 319 Md. 180, 183, 571 A.2d 1239 (1990). "Even so, as to the ultimate conclusion of whether an action taken was proper, we must make our own independent constitutional appraisal by reviewing the law and applying it to the facts of the case." *Dashiell,* 374 Md. at 93–94, 821 A.2d 372; *Nathan v. State,* 370 Md. 648, 659, 805 A.2d 1086 (2002).

## DISCUSSION

### I

At the outset, as the State points out, appellant, in his brief, "concedes that the initial stop of the green 1997 Chevrolet Malibu in which he was a passenger was proper," acknowledging that, under *Whren v. United States,* 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996), a stop for a traffic infraction, even if pretextual, is countenanced by that decision. Regarding the initial stop, appellant simply alludes to an observation made by Judge Moylan, in *Charity v. State,* 132 Md.App. 598, 753 A.2d 556 (2000), in which we cautioned that a perception that *Whren* stops are being moderately abused could lead to a withdrawal of "the weapon from the law-enforcement arsenal." *Id.* at 602, 753 A.2d 556. He does not otherwise challenge the initial stop. Thus, our review will focus only upon the length of the detention and the justification for prolonging the detention to complete the record check.

Asserting that he and the driver "were detained much longer than it reasonably should have taken to issue a warning or a citation for displaying the license plate cover" and "the continued detention was not justified by what occurred during the brief period of time that it should have taken to determine the status of the driver, passenger and vehicle," the gravamen of appellant's assignment of error, as set forth in his brief, is:

In this case the constitutional violation was the unreasonably prolonged detention or seizure of Mr. Byndloss following a traffic stop for displaying a license plate cover. The unreasonable detention led to a search of a suitcase containing male clothing, Mr. Byndloss's personal papers and co-

caine. These items were the fruit of unlawful detention. *See Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)(tangible evidence seized that as the result of an unlawful invasion is the "fruit of the poisonous tree" and must be suppressed.)

In addition to challenging the length of his detention, appellant also contends that the perceived nervousness and the inconsistencies in the precise details of Malone's trip did not constitute reasonable articulable suspicion, which would justify extending his detention.

The State, for its part, relies on the reasoning of the motions court, that "the trooper didn't anticipate that making that call for the records check was going to hit at the same time that apparently the Waterloo barracks was inundated with an inefficient dispatcher or somebody who was inundated either with a lot of calls coming in at just that particular time." Ultimately, avers the State, "the court held that the length of time that it happened to take for both the K–9 and the records check were almost exactly and precisely concurrent."

## LENGTH OF DETENTION

In this case, appellant does not challenge the time line as testified to by Sergeant Hughes, or what occurred, or the sequence of events on the morning in question. Nor does appellant controvert the court's findings that the delay was not pretextual and was occasioned by the time it took to obtain information regarding outstanding warrants or traffic infractions. Appellant recognizes, as the court put it, "a confluence of misfortune" in which, despite the inability of the K–9 unit initially to find the location of the traffic stop, it arrived simultaneously with the information that Sergeant Hughes had requested. Notably, alluding to Sergeant Hughes's attempt to "do some more investigative work while talking prearrest with the defendant Malone," the court found that "all that established was some inconsistencies in what she had told him that raised his suspicions," and the court therefore found such "reasonable suspicions" to be irrelevant to whether the

detention was legitimate because "[Sergeant Hughes] had already made the decision [to call for the K–9 unit]."

In the case *sub judice*, Sergeant Hughes wrote out a warning for violation of Maryland Code, Transportation Articles § 13–411.1(a) and § 13–411(c),[3] but did not deliver the warning to the driver, Malone.

In issuing her ruling, denying appellant's motion to suppress, the motions judge discounted Sergeant Hughes's conversation with Malone, in which he attempted to establish reasonable articulable suspicion, relating how she appeared nervous, was shaking, and gave inconsistent stories about the origin and destination of her trip. The motions judge implicitly concluded that the officer was justified in detaining appellant and Malone until such time as he was able to check both licenses and the vehicle registration as well as any outstanding warrants. Put another way, the court determined that a finding of reasonable articulable suspicion was unnecessary to support the extended detention so long as the purpose for the initial stop had not been accomplished and the investigation was ongoing.

▮▮▮ The length of the detention from the initial traffic stop at 10:58 a.m. until the K–9 unit arrived at 11:28 a.m. was thirty minutes. Rigid time limitations on traffic stops have

---

3. TR § 13–411.1., captioned Registration plate covers, provides:
 (a) In this section, "registration plate cover" means any tinted, colored, painted, marked, clear, or illuminated object that is designed to:
 (1) Cover any of the characters of a vehicle's registration plate; or
 (2) Distort a recorded image of any of the characters of a vehicle's registration plate recorded by a traffic control signal monitoring system under § 21–202.1 of this title.
 TR § 13–411(c) provides:
 (c) At all times, each registration plate shall be:
 (1) Maintained free from foreign materials, including registration plate covers as defined in § 13–411.1 of this subtitle, and in a condition to be clearly legible; and
 (2) Securely fastened to the vehicle for which it is issued:
 (i) In a horizontal position;
 (ii) In a manner that prevents the plate from swinging; and
 (iii) In a place and position to be clearly visible.

been expressly rejected by the Supreme Court. *See United States v. Sharpe,* 470 U.S. 675, 685, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985). Of course, the touchstone of any analysis of the Fourth Amendment is always "the reasonableness and all the circumstances of the particular governmental invasion of a citizen's personal security." *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889, (1968). Our determination as to whether the length of the detention after the initial traffic stop, in the case at hand, exceeded constitutional bounds is measured by whether the traffic stop was longer than necessary to effectuate the purpose of the stop. *See Terry,* 392 U.S. at 19, 88 S.Ct. 1868. ("The scope of the search must be 'strictly tied to and justified by' the circumstances which rendered its initiation permissible.").

Once the purpose of a traffic stop has been fulfilled, the continued detention of the vehicle and its occupants amounts to a second detention. *See Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). A police-driver encounter which implicates the Fourth Amendment is constitutionally permissible only if either (1) the driver consents to the continuing intrusion or (2) the officer has, at a minimum, a reasonable articulable suspicion that criminal activity is afoot. *Wilkes v. State,* 364 Md. 554, 572–73, 774 A.2d 420 (2001) (quoting *Ferris,* 355 Md. at 372, 735 A.2d 491). More specifically, in *Pryor v. State,* 122 Md.App. 671, 716 A.2d 338 (1998), *cert. denied,* 352 Md. 312, 721 A.2d 990 (1998), we concluded that a person stopped for a minor traffic violation "cannot be detained at the scene of the stop longer than it takes—or reasonably should take—to issue a citation for the traffic violation that the motorist committed." *Pryor,* 122 Md.App. at 674–75, 716 A.2d 338. We held that waiting for the K–9 unit to arrive amounted to an unjustified second detention.

In *Wilkes,* the Court of Appeals considered the factors in determining whether a detention pursuant to an investigative stop is too long in duration:

The Supreme Court has expressly rejected imposing rigid time limitations on traffic stops. In that case, [*Sharpe* ] the Supreme Court noted that as "[m]uch as a 'bright-line' rule would be desirable, in evaluating whether an investigative detention is unreasonable, common sense and ordinary human experience must govern over rigid criteria." The Supreme Court continued:

> In assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant. A court making this assessment should take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second-guessing. A creative judge engaged in *post hoc* evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished. But "[t]he fact that the protection of the public might, in the abstract, have been accomplished by 'less intrusive' means does not, itself, render the search unreasonable." The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it.

*Id.* at 576–77, 774 A.2d 420 (citations omitted).

We also considered the length of detention of a suspect after a traffic stop in *Pryor*, where Chief Judge Murphy, writing for this Court, explained:

> This appeal . . . requires that we examine an important rule of engagement applicable to the forcible stop of a motorist who commits a minor traffic violation while under police surveillance: the point in time at which continued detention violates the motorist's Fourth Amendment protection against unreasonable searches and seizures. We hold that, unless continued detention can be justified by what occurs during the brief period of time it takes to determine wheth-

er the motorist has a valid license and whether the vehicle has been reported stolen, a motorist who is subjected to a "*Whren* stop" for a minor traffic violation cannot be detained at the scene of the stop longer than it takes—or reasonably should take—to issue a citation for the traffic violation that the motorist committed.

122 Md.App. at 674–75, 716 A.2d 338. *See also Nathan,* 370 Md. at 661–62, 805 A.2d 1086.

Other jurisdictions are in accord. *See, e.g., U.S. v. Mendez,* 118 F.3d 1426, 1428–29 (10th Cir.1997) (once all computer checks are completed, namely, license, registration, and warrant checks, the initial purpose for the stop has been accomplished, and the police officer may no longer detain the vehicle); *United States v. Walker,* 933 F.2d 812, 816 n. 2 (10th Cir.1991) ("[O]ur determination that the defendant was unlawfully detained might be different if the questioning by the officer did not delay the stop beyond the measure of time necessary to issue a citation. For example, this case would be changed significantly if the officer asked the same questions while awaiting the results of an NCIC license or registration inquiry."); *United States v. Shabazz,* 993 F.2d 431, 437 (5th Cir.1993) ("[W]e have no doubt that in a valid traffic stop, an officer can request a driver's license, insurance papers, vehicle registration, run a computer check thereon, and issue a citation."); *State v. Holman,* 221 Neb. 730, 380 N.W.2d 304, 307 (1986) (police officer may check history of driver's license, registration, and search for outstanding warrants as part of a routine traffic stop).[4]

---

4. The *Wilkes* Court, 364 Md. at 578–80, 774 A.2d 420, collected a comprehensive compendium of court decisions that discuss investigative procedures in effectuating a routine traffic stop:

Conducting checks of driver's licenses, vehicle registration, and possible warrants is reasonable. *See United States v. Mendez,* 118 F.3d 1426, 1429 (10th Cir.1997) ("An officer conducting a routine traffic stop may run computer checks on the driver's license, the vehicle registration papers, and on whether the driver has any outstanding warrants or the vehicle has been reported stolen. However, once the computer checks confirm that the driver has produced a valid license and proof of entitlement to operate the car, the driver must be

permitted to proceed on his way, without further delay by police for additional questioning.") (internal citations omitted); *United States v. McRae*, 81 F.3d 1528, 1535 n. 6 (10th Cir.1996) (noting that an officer conducting a routine traffic stop is authorized to conduct a computer check); *State v. Holman*, 221 Neb. 730, 732–33, 380 N.W.2d 304, 307 (1986) (check of driver's history, registration, and for outstanding warrants is part of the normal procedure for a traffic stop); *State v. Bell*, 382 So.2d 119, 120 (Fla.Dist.Ct.App.1980) (police are authorized to determine if there is an outstanding warrant for arrest during stop); *Clark v. State*, 171 Ind.App. 658, 358 N.E.2d 761, 763 (1977) (Police officer's radio call to headquarters to check on any outstanding warrants of defendant was within the scope of the initial investigatory stop). Such holdings make sense as modern technology has availed police officers with the ability to quickly access relevant information without unnecessarily prolonging the duration of the stop or unreasonably increasing the level of intrusion. *See United States v. Gonzalez*, 763 F.2d 1127, 1130 (10th Cir.1985) ("The police officer had a car radio and contact thereby with dispatchers who had instant access to the National Crime Information Center (NCIC) computer records that could quickly resolve, with reasonable certainty, whether there were warrants outstanding against the driver and whether the car had been reported stolen.").

It is noted in *Mendez, supra*, the police officer's check for outstanding warrants came back negative at what appears to be approximately the same time as the results of the driver's license and vehicle registration search. *See Mendez*, 118 F.3d at 1428. That court did not appear to be attempting to distinguish between the driver's license/vehicle registration searches and the check for warrants— merely that once all the checks were completed and the reasonable articulable suspicion, which justified the initial purpose for the stop was eliminated, there was no longer any justifiable or legitimate reason for detaining the driver.

The action taken by Trooper Graham to run computer checks on petitioner's driver's license, vehicle registration, and possible warrants was reasonable. Similarly, the investigatory measures implemented by Trooper Graham and the backup troopers during the time they were awaiting the results of the computer checks were permissible. In 1993, the Court of Appeals for the Fifth Circuit considered a similar argument in a case where police questioned a driver and passenger while awaiting the results of a computer check in *United States v. Shabazz*, 993 F.2d 431 (5th Cir.1993). That court stated:

Here, appellants cannot successfully claim that the detention exceeded its original scope. Appellants concede, and we have no doubt, that *in a valid traffic stop, an officer can request a driver's license, insurance papers, vehicle registration, run a computer check thereon, and issue a citation.* In this case, Officer LaChance asked Shabazz to exit the vehicle and produce his driver's license. He then called in for a computer check of the license. The questioning that took place occurred while the officers were waiting for the results of the computer check. Therefore, the questioning did nothing to extend the duration of the initial, valid seizure. Because the officers were still waiting for the computer check at the time that they

In *Wilkes*, the officer pulled the defendant over for speeding and asked him for his license and registration. After asking the defendant a few basic questions about where he was going, the officer radioed his barracks to "request that they conduct a check on [the defendant's] driver's license and registration, as well as for any possible outstanding warrants," as this was "routine procedure." 364 Md. at 563, 774 A.2d 420. While waiting for the background check, a K–9 officer arrived, and a K–9 sniff was conducted around the vehicle. The dog alerted the officer to the presence of narcotics. The Court of Appeals concluded that these actions were "reasonable ... while awaiting the results of a computer check," as "there was no evidence presented at the suppression hearing that the trooper prolonged the stop any longer than necessary. His goal was clearly to conduct a diligent and complete traffic stop." *Id.* at 577, 580, 774 A.2d 420. The Court continued, "The fact that he continued to investigate the scene while waiting for the results of [the defendant's] background check does not amount to a violation of [the defendant's] Fourth Amendment rights." *Id.* at 577, 774 A.2d 420. The Court further noted that even if the stop, as the defendant suggested, was pretextual, the trooper's conduct was permissible, because, as in the case *sub judice*, "he had probable cause to make the traffic stop and the K–9 scan was performed *prior to* receiving the complete results of the computer check." *Id.* at 577 n. 17, 774 A.2d 420. The Court held:

> The traffic stop ... was not extended beyond the period necessary to complete that stop. The K–9 unit arrived on the scene and conducted the scan ... prior to [the officer]

received consent to search the car, the detention to that point continued to be supported by the facts that justified its initiation. *Id.* at 437 (footnote omitted) (citations omitted); *see also United States v. Crain*, 33 F.3d 480, 485 (5th Cir.1994) ("[W]hen questioning takes place while officers are waiting for the results of a computer check—and therefore does not extend the *duration* of the stop—the questioning does not violate *Terry*."). Thus, a reasonable continued investigation of the scene, while awaiting the results of a computer check was permissible police procedure under the Fourth Amendment. *Id.* at 578–80.

receiving radio verification of the validity of [the defendant's] driver's license, vehicle registration card, and warrants check. Thus, the traffic stop was ongoing at the time the K–9 scan was employed.

*Id.* at 588, 774 A.2d 420.

■■■ Once a police officer pulls a vehicle over, conducts a license, registration, and warrant check, and then issues the citation, the stop is completed and, unless reasonable suspicion exists to detain the vehicle any longer, the officer must release the vehicle and its passengers. *See, e.g., Munafo v. State,* 105 Md.App. 662, 672–73, 660 A.2d 1068 (1995) (once the officer had determined that the vehicle was not stolen and a background check was run on the driver's license, the officer should have issued the citation and released the vehicle).

It is beyond cavil, as explicated *supra,* that the law contemplates a record check for outstanding warrants or other infractions as part of the initial stop for the traffic violation. The Court of Appeals has unequivocally confirmed the principle that "[i]t is clear that an officer conducting a routine traffic stop may request a driver's license, vehicle registration, and insurance papers, run a computer check, and issue a citation or warning." *Nathan,* 370 Md. at 661–62, 805 A.2d 1086. We have similarly opined that a single detention takes place and a K–9 scan for drugs is constitutionally permissible in situations where the scan is "at a point in time when the trooper 'was still awaiting the results of the license and registration check [and] the scan did not prolong the detention.' " *Graham v. State,* 119 Md.App. 444, 469, 705 A.2d 82 (1998) (quoting *Munafo,* 105 Md.App. at 671–72, 660 A.2d 1068). *See McKoy v. State,* 127 Md.App. 89, 732 A.2d 312 (1999) (after stopping the defendant's vehicle for speeding, the officer obtained the license of the defendant and, before the dispatcher responded to the officer's request for information on the defendant's license and before the citation was written, it was permissible for the K–9 to sniff the vehicle).

In a case factually on point with *Graham,* we opined in *In re Montrail M.,* 87 Md.App. 420, 589 A.2d 1318 (1991), that the

officer had reasonable suspicion to detain the vehicle, as it was in an isolated area in the early morning hours. After the officer asked for the driver's license and registration to "run a check," the canine unit arrived. *Id.* at 429, 589 A.2d 1318. Before the check was completed, the canine quickly scanned the vehicle and indicated the presence of drugs. We held that "only one detention occurred," as the "trained dog arrived on the scene while [the police officer] was still running a check on [the defendant's] license and registration, and the scan took place as the deputy completed the check." *Id.* at 437, 589 A.2d 1318. *See Graham,* 119 Md.App. at 458, 705 A.2d 82 (citing *Montrail* with approval for an example of what constitutes a single detention). The initial reason for the traffic stop in this case—a concealed license plate—was still ongoing when the K–9 arrived and conducted the scan of appellant's vehicle. Fortuitously, the computer check had not been completed in spite of the fact that Trooper First Class Butler and the K–9 Unit were delayed because the Trooper was unable to find the location of the traffic stop. Particularly relevant to the case at hand, we stated in *Pryor,* although not applicable to the facts in that case, that "an extended detention of the motorist could be justified by ... technical difficulties in determining the status of the motorist's license or the ownership of the vehicle that has been stopped." 122 Md.App. at 681 n. 7, 716 A.2d 338.

In *Snow v. State,* 84 Md.App. 243, 578 A.2d 816 (1990), unlike the case at hand, after pulling the vehicle over for speeding, the officer obtained the driver's license and registration to run a computer check and issue a citation. After verifying the validity of the license and registration and issuing the citation, the officer detained the motorist, without further reasonable suspicion, to await the arrival of a K–9 to sniff the vehicle. We held that this constituted two separate detentions, as the officer lacked reasonable suspicion to detain the vehicle after the check was finished and the citation issued. *Id.* at 265–67, 578 A.2d 816.

In *Graham,* 119 Md.App. at 456, 705 A.2d 82, we concluded that the detention of the passenger for twenty-five minutes

between the initial stop of the vehicle and the arrival of a canine officer and drug-sniffing dog was unreasonable and violated the Fourth Amendment when the purpose of the stop was accomplished within the first five minutes.

 From the above authorities, certain precepts emerge. First, whether a detention pursuant to a traffic stop is too long to pass constitutional muster depends not upon its length, but upon the facts and circumstances of the case in its entirety as presented on the record of the suppression hearing. Foremost, in any consideration of whether such detention violates the Fourth Amendment is that a motorist cannot be detained longer than it *reasonably* takes to issue a citation for the traffic violation for which he/she was stopped. Any detention beyond the time it takes to accomplish the purpose for which the traffic stop was made amounts to a second detention and must be supported by reasonable articulable suspicion. *See also Illinois v. Caballes,* —— U.S. ——, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005).

## DILIGENCE, *VEL NON*, OF SERGEANT HUGHES

There was no second detention in the case *sub judice*. Appellant's only oblique suggestion of a second detention is his assertion: "Given that the basis for the traffic stop was the display of a license plate cover, that all documents requested were produced and there was no evidence that they were out of order, Sergeant Hughes was required to conclude the traffic stop and send Ms. Malone and appellant on their way much sooner than he did." His only point, arguably, is that the warning—written but not issued—effectively accomplished the purpose of the traffic stop, e.g., enforcement of TR § 13–411.1(a) and § 13–411.1(c).

 In view of the overwhelming authority set forth, *supra*, reaffirming that the purpose of a routine traffic stop is not accomplished until completion of the check of a motorist's driver's license and vehicle registration and for outstanding warrants, the writing of a warning which is not delivered to

the motorist does not effectively end the initial detention and initiate a second detention.

As noted, an officer, in conducting a routine traffic stop, may lawfully run a computer check on the driver's license and the vehicle registration papers and he may determine whether the driver has any outstanding warrants or the vehicle has been reported stolen. In challenging whether Sergeant Hughes proceeded reasonably, appellant questions whether he was detained longer than it should have taken to issue a citation for the traffic infraction, essentially raising the issue of the diligence exercised by Sergeant Hughes.

In a nutshell, appellant's only challenge is to the court's finding of fact: "But I don't see anything other than due diligence in the officer's part in making the stop."[5] Appellant argues that the nine minutes Sergeant Hughes waited to get a response from the Waterloo barrack, from 11:10 a.m. to 11:19 a.m., and the additional four minutes, from 11:19 a.m. to 11:23 a.m., was too long before trying to obtain a check of the driver's and passenger's licenses, the vehicle registration, and possible outstanding warrants from another barrack. At the point in time when the drivers' licenses of the occupants and the vehicle registration were produced and found to be in order, Sergeant Hughes, contends appellant, "was required to conclude the traffic stop and send Ms. Malone and Mr. Byndloss on their way much sooner than he did." "At the very least," he says, "Sergeant Hughes should have released the motorists at 11:23 a.m. when he called the Waterloo barrack and was told that they were very busy."

Appellant baldly asserts that "Sergeant Hughes did not diligently pursue the record checks." He supports this assertion by arguing that another barrack should have been contacted immediately when Sergeant Hughes learned that the computer system at the College Park barrack was not in operation. In keeping with the brevity of any detention

---

**5.** We assume that the reference to due diligence in "making the stop" referred to the stop generally including the period of detention.

pursuant to such routine stops, the Supreme Court has articulated the need for investigating officers to proceed diligently in accomplishing the purpose for which the traffic stop was made, including completion of the record checks.

In *United States v. Sharpe,* 470 U.S. 675, 686–688, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985), the Court, in discussing whether the officer in that case exercised proper diligence, concluded:

> Clearly this case does not involve any delay unnecessary to the legitimate investigation of the law enforcement officers. Respondents presented no evidence that the officers were dilatory in their investigation. The delay in this case was attributable almost entirely to the evasive actions of Savage, who sought to elude the police as Sharpe moved his Pontiac to the side of the road. Except for Savage's maneuvers, only a short and certainly permissible pre-arrest detention would likely have taken place. The somewhat longer detention was simply the result of a "graduate[d] ... respons[e] to the demands of [the] particular situation," *Place, supra,* 462 U.S. at 709, n. 10, 103 S.Ct. 2637.

* * *

> We reject the contention that a 20–minute stop is unreasonable when the police have acted diligently and a suspect's actions contribute to the added delay about which he complains. The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

Considerations in a determination as to whether officers have comported with the Fourth Amendment requirement of brevity and that measures employed be the least intrusive under the circumstances are: whether the officers' actions are pretextual and an intentional attempt to extend the length of the detention; whether an inordinate delay in verifying background information is attributable to factors outside the control of the detaining officer; and whether there are alternative measures to accomplish the purposes of the traffic

stop that would obviate the need for an extended delay. Appellant only relies on the third factor to support his claim.[6]

■ Constrained to acknowledge that waiting for record checks to be completed was within the purview of a routine traffic stop, appellant can only suggest, as an alternative to the course of action taken by Sergeant Hughes, that he should have called the Waterloo barrack seven minutes earlier at 11:02 or he should have made a follow-up call to the College Park barrack, rather than writing a warning, which, avers appellant, took six minutes. We cannot say that the means of investigation employed by Sergeant Hughes was unreasonable or unremarkable under decisions of the Supreme Court, the Court of Appeals, and our prior decisions. Conceivably, the Supreme Court or Maryland courts may well be presented with some combination of extraordinary length of delay, i.e., one, two hours or more, occasioned by a deliberate intent to delay, and/or circumstances beyond the control of the investigating officer, which exceeds the "tipping point" beyond which the Fourth Amendment strictures are offended,[7] but the case

---

6. Although the thrust of appellant's argument in his brief is that Sergeant Hughes should have resorted to other means to attempt to obtain the information requested, at oral argument before a panel of this Court, the gravamen of the argument by his appellate counsel was that, at some point in time, notwithstanding that the check of the drivers' licenses, vehicle registration and outstanding warrants had not been accomplished, the sheer length of the detention offended the Fourth Amendment and required that appellant and Malone be released. Counsel queried, at what point—one hour, two hours—during which the information sought cannot be verified and no reasonable articulable suspicion or probable cause is discovered, must the detainees be released. We decline to address appellant's hypothetical in a case in which the detention was thirty minutes.

7. In an impassioned dissent, noting that the Court had said in *Dunaway*: "A single, familiar standard is essential to guide police officers, who have only limited time and expertise to reflect on and balance the social and individual interests involved in the specific circumstances they confront," 442 U.S. at 213–214, 99 S.Ct. 2248, Justice Brennan observed in *Sharpe:*

The requirement that *Terry* stops be brief no matter what the needs of law enforcement in the particular case is buttressed by several sound

pragmatic considerations. First, if the police know they must struc-
ture their *Terry* encounters so as to confirm or dispel the officer's
reasonable suspicion in a brief time, police practices will adapt to
minimize the intrusions worked by these encounters. Cf. *United
States v. Place, supra* (to assure brevity of *Terry* airport stops, narcotic
detection dogs must, under some circumstances, be kept in same
airport to which suspect is arriving). Firm adherence to the require-
ment that stops be brief forces law enforcement officials to take into
account from the start the serious and constitutionally protected
liberty and privacy interests implicated in *Terry* stops, and to alter
official conduct accordingly.

\* \* \*

We have recognized that the methods employed in a *Terry* stop
"should be the least intrusive means reasonably available to verify or
dispel the officer's suspicion in a short period of time." Yet in the
absence of a per se *requirement that stops be brief, defining what
means are "least intrusive" is a virtually unmanageable and unbound-
ed task. Whether the police have acted with due diligence is a function
not just of how quickly they completed their investigation, but of an
almost limitless set of alternative ways in which the investigation
might have been completed. For example, in this case the Court posits
that the officers acted with due diligence, but they might have acted
with more diligence had Cooke summoned two rather than one high-
way patrolman to assist him, or had Cooke, who had the requisite
"training and experience," stopped the pickup truck—the vehicle
thought to be carrying the marihuana. See generally post, at 1589–
1591 (BRENNAN, J., dissenting). And if due diligence takes as fixed
the amount of resources a community is willing to devote to law
enforcement, officials in one community may act with due diligence in
holding an individual at an airport for 35 minutes while waiting for
the sole narcotics detection dog they possess, while officials who have
several dogs readily available may be dilatory in prolonging an airport
stop to even 10 minutes.*
Constitutional rights should not vary in this manner. Yet in the
absence of a brevity standard that is independent of the actions or
needs of the police, that variance is one of two inescapable results.
The other is that the Court will have to take seriously its requirement
that the police act with due diligence, which will require the Court to
inject itself into such issues as whether this or that alternative
investigative method ought to have been employed.

\* \* \*

The police themselves may have done nothing unreasonable in
holding a motorist for one hour while waiting for a registration
computer to come back on line, but surely such a prolonged deten-
tion would be unlawful. Indeed, in my view, as soon as a patrolman
called in and learned that the computer was down, the suspect would
have to be released. That is so not because waiting for information
in this circumstance is unreasonable, but simply because the stop
must be brief if it is to be constitutional on less than probable cause.
A "balancing" test suggests that a stop is invalid only if officials have
crossed over some line they should have avoided; the finding that
such a "balance" has been struck improperly casts a certain moral
opprobrium on official conduct. A brevity requirement makes clear

at hand does not remotely reach that point. The Supreme Court has made an express pronouncement disfavoring "second-guessing" possible alternatives that could have effectively shortened a detention. Notwithstanding the dissent by Justice Brennan, the Court has explicitly rejected a *per se* rule that, in essence, presumptively imputes dilatory conduct.

## CONCLUSION

Relying on *Graham, supra,* and *Whitehead v. State,* 116 Md.App. 497, 504–05, 698 A.2d 1115 (1997), appellant contends that there was no reasonable articulable suspicion to support the prolonged detention. If the officer in this case had received the information he requested from the dispatcher in a timely manner and found there to be no outstanding warrants and the drivers' licenses and vehicle registered to be in order, the officer would have been required immediately to issue the citation and release appellant. We need not consider whether the inconsistent stories or nervousness of the driver, Malone, established reasonable articulable suspicion because we have concluded, as did the motions judge, that the evidence regarding reasonable articulable suspicion is immaterial, in view of the fact that the purpose for the stop had not been accomplished before the K–9 Unit arrived. Therefore, there was only a single detention. The requirement that there be reasonable articulable suspicion to support the *continued* detention of appellant presupposes that there was a second detention.

Sergeant Hughes pursued the information through two different dispatchers at different barracks. Appellant suggests no alternative that would have substantially expedited the computer check. The initial stop was not concluded and, therefore, no additional reasonable suspicion was needed to

---

that the Constitution imposes certain limitations on police powers no matter how reasonably those powers have been exercised. "[H]airsplitting distinctions that currently plague our Fourth Amendment jurisprudence" serve nobody's interest, *New York v. Quarles,* 467 U.S. 649, 664, 104 S.Ct. 2626, 2635, 81 L.Ed.2d 550 (1984)

470 U.S. at 693–96, 105 S.Ct. 1568 (Footnotes omitted).

support continued detention of the vehicle, beyond that which supported the initial stop for violation of the traffic laws. By the time the record check information was finally relayed to the officer, revealing that appellant had an extensive criminal background, the K–9 dog had already signaled that there were drugs in the vehicle, and the officers then validly searched it. *See, e.g., Wallace v. State,* 142 Md.App. 673, 686, 791 A.2d 968 (2002) (probable cause exists to search a vehicle once a drug dog alerts the officers to the potential presence of drugs in it). The detention lasted only long enough to complete procedures incident to the traffic stop.

**JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**