893 A.2d 1119

Orlando BYNDLOSS

v.

STATE of Maryland.

No. 54 Sept. Term, 2005.

Court of Appeals of Maryland.

March 8, 2006.

Amy E. Brennan, Asst. Public Defender (Nancy S. Forster, Public Defender, on brief), Baltimore, for Petitioner.

Brian S. Kleinbord, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. of Md., on brief), Baltimore, for Respondent.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

CATHELL, Judge.

■ This case concerns whether a police officer may detain the occupants of a vehicle for approximately thirty minutes, after the driver and passenger have both provided driver's licenses and registration for the vehicle and the officer has written a warning for the traffic violation, while waiting for confirmation of the validity of the licenses and registration and checking for outstanding warrants. The central issue is whether the period of time that the driver and passenger were detained while the officer retrieved the information improperly extended the traffic stop beyond what is considered reasonable under the Fourth Amendment of the United States Constitution or Article 26 of the Maryland Declaration of Rights.[1]

---

1. Article 26 of the Maryland Declaration of Rights is, generally, *in pari materia* with the Fourth Amendment of the United States Constitution.

■■■■■■■

Petitioner, Orlando Byndloss, was charged in the Circuit Court for Prince George's County with importation of 28 or more grams of cocaine (count one),[2] possession of 448 or more grams of cocaine with intent to distribute (count two),[3] possession of cocaine with intent to distribute (count three),[4] conspiracy to distribute cocaine (count four), and possession of cocaine (count five).[5] On March 19, 2004, a pretrial hearing was

---

*Fitzgerald v. State,* 384 Md. 484, 506, 864 A.2d 1006, 1019 (2004) (citing *Gahan v. State,* 290 Md. 310, 319, 430 A.2d 49, 54 (1981)).

**2.** Maryland Code (2002), § 5–614 of the Criminal Law Article states in pertinent part:

"(a) *Unlawful amounts.*—(1) Unless authorized by law to possess the substance, a person may not bring into the State:

. . .

(ii) 28 grams or more of cocaine;

. . .

(2) A person who violates this subsection is guilty of a felony and on conviction is subject to imprisonment not exceeding 25 years or a fine not exceeding $50,000 or both."

**3.** Maryland Code (2002), § 5–612 of the Criminal Law Article states in pertinent part:

"(a) *Unlawful amounts.*—A person who violates § 5–602 of this subtitle with respect to any of the following controlled dangerous substances in the amounts indicated is subject on conviction to a fine not exceeding $100,000 and the enhanced penalty provided in subsection (c) of this section:

. . .

(2) 448 grams or more of cocaine;

. . .

(c) *Enhanced penalty.*—(1) A person who is convicted under § 5–602 of this subtitle with respect to a controlled dangerous substance in an amount indicated in subsection (a) of this section shall be sentenced to imprisonment for not less than 5 years."

**4.** Maryland Code (2002), § 5–602 of the Criminal Law Article states: "Except as otherwise provided in this title, a person may not:

(1) manufacture, distribute, or dispense a controlled dangerous substance; or

(2) possess a controlled dangerous substance in sufficient quantity reasonably to indicate under all circumstances an intent to manufacture, distribute, or dispense a controlled dangerous substance."

**5.** Maryland Code (2002), § 5–601 of the Criminal Law Article states in pertinent part:

"(a) *In general.*—Except as otherwise provided in this title, a person may not:

held before the Circuit Court for Prince George's County concerning petitioner's motion to suppress the drug evidence. The motion was denied. On March 24, 2004, petitioner was subsequently tried and convicted on all counts, except conspiracy to distribute cocaine (count four), at a bench trial before the Circuit Court for Prince George's County. On May 7, 2004, the Circuit Court imposed a sentence of 15 years for importation of cocaine (count one) and a concurrent 15 years, the first five without the possibility of parole, for possession of 448 grams or more of cocaine with intent to distribute (count two). Counts three and five were merged with count two for sentencing purposes. Petitioner appealed to the Court of Special Appeals and that court affirmed the conviction. *Byndloss v. State*, 162 Md.App. 286, 873 A.2d 1233 (2005). On June 21, 2005, petitioner filed a petition for writ of certiorari. On August 10, 2005, we granted certiorari. *Byndloss v. State*, 388 Md. 404, 879 A.2d 1086 (2005).

Petitioner presented only one question:

"During a routine traffic stop, may a State trooper withhold the issuance of a written warning and continue to detain the occupants of a vehicle after the driver and passenger have both provided driver's licenses and registration for the vehicle and the trooper has written a warning for the traffic infraction, but he has not issued it to the driver because the computer system, through which record[s] are checked, is inoperable, preventing the trooper from confirming the validity of the licenses and registration and checking for outstanding warrants?"

We hold that, under the particular factual circumstances of the case at bar, the police did not improperly detain petitioner.

---

(1) possess or administer to another a controlled dangerous substance, unless obtained directly or by prescription or order from an authorized provider acting in the course of professional practice; or

. . .

(c) *Penalty.*—(1) Except as provided in paragraph (2) of this subsection, a person who violates this section is guilty of a misdemeanor and on conviction is subject to imprisonment not exceeding 4 years or a fine not exceeding $25,000 or both."

Accordingly, we affirm the judgment of the Court of Special Appeals.

## I. Facts

On November 19, 2003, Sergeant Clifford Hughes[6] of the Maryland State Police was on duty in the area of I–95 and I–495 in Prince George's County. At approximately 10:58 a.m. Sergeant Hughes observed a 1997 green Chevrolet Malibu with Florida registration plates driving north on I–95. The vehicle had a plastic license plate cover over its registration plate. The license plate of the vehicle was not clearly visible due to the plastic cover, in fact, "the vehicle registration tags and month were not visible at all."[7] As a result of this

---

**6.** According to his testimony at the March 19, 2004, motions hearing, Sergeant Hughes was assigned to the Special Operations section of the Interstate Criminal Enforcement Team. He had twelve years of police experience: two as a Suffolk, Virginia police officer (from 1992–1994) and ten years as a Maryland State Trooper. Sergeant Hughes testified that his duties as a member of the Interstate Criminal Enforcement Team were as follows:

> "Our main objective is traffic enforcement on the interstates throughout Maryland. We are to intercept the bulk shipment of drugs, untaxed cigarettes, currency, illegal weapons, and any other contraband, as well as identify interstate terrorists, and we accomplish that through aggressive, proactive traffic enforcement."

Further addressing what he meant by "aggressive, proactive traffic enforcement," Sergeant Hughes stated that, "[w]e go out and we look for violations, traffic violations." If they discover a traffic violation, Sergeant Hughes testified that:

> "We do what we call the complete traffic stop process. We identify the operator and/or passengers in the vehicle, we look for anything basically out of place, indicate if there is criminal activity, whether it be nervousness or any other things that you don't see in a normal traffic stop, and just follow through with it."

**7.** Maryland Code (1977, 2002 Repl.Vol.), § 13–411 of the Transportation Article states in pertinent part:

> "(c) *How plates fastened; legibility.*—At all times, each registration plate shall be:
> (1) Maintained free from foreign materials, including registration plate covers as defined in § 13–411.1 of this subtitle, and in a condition to be clearly legible; . . . ."

Maryland Code (1977, 2002 Repl.Vol.), § 13–411.1 of the Transportation Article states in pertinent part:

violation of § 13–411 of the Transportation Article, Sergeant Hughes activated his emergency equipment and pulled the vehicle over.[8] Petitioner was a passenger in this vehicle.

Sergeant Hughes called in the stop to the College Park barrack and was advised that the computer systems through which licenses, vehicle registrations, and outstanding warrants are checked were down. The two systems are known as (1) Maryland Interagency Law Enforcement System (MILES) and (2) National Crime Information Center (NCIC). During the call Sergeant Hughes was not given any indication of when the systems would be up and operating again.

At 10:59 a.m. Sergeant Hughes walked up to the vehicle on the passenger side.[9] He knocked on the window of the front seat passenger. Petitioner, sitting in the front passenger seat, put the window down. Sergeant Hughes identified himself as a Maryland State Trooper and advised the driver, Joan Henry Malone, and passenger, petitioner, that they were being audibly and visually recorded.[10] Sergeant Hughes then asked Ms. Malone for her driver's license and registration. He explained that the reason for the stop was the plastic cover on the vehicle license plate. Ms. Malone stated that she didn't know that it was illegal and volunteered to remove it from the vehicle. Sergeant Hughes explained to her that it was too dangerous to do that due to the traffic on I–95. Throughout

---

"(a) *Definition.*—In this section, 'registration plate cover' means any tinted, colored, painted, marked, clear, or illuminated object that is designed to:

(1) Cover any of the characteristics of a vehicle's registration plate; or

(2) Distort a recorded image of any of the characters of a vehicle's registration plate recorded by a traffic control signal monitoring system under § 21–202.1 of this title."

**8.** At this time a second state trooper, in a separate vehicle, also pulled over to assist with the stop.

**9.** Sergeant Hughes in his testimony termed this the "alternate approach" which is used for officer safety purposes due to the traffic on I–95.

**10.** The record contains the DVD recording of the stop in its entirety.

this conversation Ms. Malone was still looking for her driver's license and registration card.

When Ms. Malone handed over her driver's license and registration card Sergeant Hughes noticed that her hands were shaking and that she seemed "nervous" and "restless." Sergeant Hughes asked Ms. Malone where she was going and she told him that she was on her way from Florida to New York. At this time petitioner also gave Sergeant Hughes his driver's license.[11] At 11:02 a.m. the conversation ended and Sergeant Hughes went back to his vehicle with the driver's licenses and registration card.

Sergeant Hughes sat in his vehicle, called for a K-9 unit, and then proceeded to write a warning for the license plate cover. He did not immediately call his dispatcher and ask them to run Ms. Malone's and petitioner's information through MILES and NCIC because he had been informed that the systems were down. Sergeant Hughes testified that he told the other officer on the scene "I'm going to talk to them a little more, she is real nervous." At 11:08 a.m., when he was finished writing the warning, Sergeant Hughes called back the College Park barrack and asked whether the systems were still down. The dispatcher advised him that the systems were still down, but that the problem only affected the College Park barrack. The dispatcher then advised him to contact either the Rockville or Forestville barrack because their systems were up and functioning. Sergeant Hughes then decided to hold off on giving Ms. Malone the written warning because he had not yet been able to run the licenses and registration through MILES and NCIC.

At 11:09 a.m. Sergeant Hughes switched over to another channel and called the Waterloo barrack, which was the closest barrack, approximately three miles north of the stop.

---

11. There is no information in the record as to why or how Sergeant Hughes obtained petitioner's driver's license, nor has it been raised as an issue in the case *sub judice*. Therefore, we shall not address the permissibility of an officer obtaining such information from a passenger.

Upon receiving the call, the dispatcher at the Waterloo barrack advised Sergeant Hughes that he could not hear him due to background noise or interference. At 11:10 a.m. Sergeant Hughes called the Waterloo dispatcher back using his cell phone. Sergeant Hughes requested license and outstanding warrant checks for Ms. Malone and petitioner and provided the dispatcher with the information from their driver's licenses and Ms. Malone's registration card. The Waterloo dispatcher said that he would call him back with the information.

While waiting to hear back from the Waterloo dispatcher, Sergeant Hughes got out of his vehicle and approached Ms. Malone's car. He explained to her that he was waiting for a license and warrant check to come back, and as soon as that came back, they would be free to go. He then asked Ms. Malone to step out of the car and come to the rear of the vehicle. Sergeant Hughes testified that he again explained to her that "apparently the system was being slow today and as soon as the information came back, she would be free to go, and explained to her because of liability purposes, [he] couldn't allow her to drive away without knowing if her license was suspended or anything." Sergeant Hughes then asked Ms. Malone again about her trip and where she was going:

> "She told me she was going to New Jersey, and she had previously told me she was going to New York. I asked her did she have a lot of luggage in the vehicle and she said no. She had previously told me she was going to stay a week, and I asked her how she was going to stay a week without a lot of luggage, and she stated that she wasn't going to stay a week because she had to go back to work. Her stories were inconsistent with what she had previously stated to me. And at that time I also noticed that her eyes were watering and she appeared to be crying. She was jumpy. She couldn't keep still and she was holding herself."

On the video of the stop it is evident that it had become windy as Sergeant Hughes and Ms. Malone were standing outside and Ms. Malone stated that she was cold. After finishing their conversation, Sergeant Hughes returned to his police car and Ms. Malone remained standing outside.

At 11:19 a.m. Sergeant Hughes received a call from the College Park dispatcher informing him that Trooper First Class (TFC) Butler, the certified K–9 handler, could not locate Sergeant Hughes. After this call Sergeant Hughes called back the Waterloo barrack to see if they had received the information from MILES and NCIC. The Waterloo police communications officer told him to "stand by," which, according to the officer's testimony, means to wait and not transmit. At this point, Sergeant Hughes asked Ms. Malone, who was still outside on the side of the road, if she wanted to have a seat in his car and she agreed. Sergeant Hughes again explained to her that he was still waiting on the checks. After she further initiated conversation, he asked her whether "there were any weapons, narcotics, untaxed cigarettes, contraband, currency, et cetera, in the vehicle, and she said no." At 11:23 a.m. Sergeant Hughes called back the Waterloo barrack using his cell phone and spoke to the duty officer. He advised the duty officer that the police communications officer was taking a long time and was informed that they were very busy and would get back to him.

At 11:26 a.m. TFC Butler, the K–9 handler, arrived. Sergeant Hughes spoke with TFC Butler and asked him to conduct a scan of Ms. Malone's vehicle, which TFC Butler then began to do. At 11:27 a.m. the Waterloo barrack communications operator called Sergeant Hughes back and said that petitioner had an extensive criminal background in New York and Florida, but did not provide any information at this time on Ms. Malone. Soon thereafter, at approximately 11:30 a.m., Sergeant Hughes testified that:

"At the same time TFC Butler is running the dog around the vehicle, I observed the dog sit to the right-rear side of the vehicle, which I knew as a positive sit alert for the presence of narcotics.... I then explained to [Ms. Malone] that based on the positive sit alert of the K–9, that I was going to conduct a probable cause search of her vehicle."

Petitioner was asked to get out of Ms. Malone's vehicle and Sergeant Hughes and TFC Butler then conducted a thorough search of that car from 11:30 a.m. to 11:40 a.m. A search of a

large suitcase found in the trunk revealed male clothes packed tightly together and in the center of the suitcase, in a white plastic bag, two plastic vest-like panels taped with yellow masking tape. These packages contained approximately two kilograms of cocaine.[12] Sergeant Hughes then arrested Ms. Malone and petitioner.

The Waterloo barrack's dispatcher never called back with further information concerning Ms. Malone or petitioner. After the arrests, Sergeant Hughes returned to the College Park barrack and had the police communications officer run Ms. Malone's information through MILES and NCIC.

After the preceding testimony, the Circuit Court at the "Motion to Suppress" hearing issued its ruling:

"In this instance, we have a confluence of misfortune on behalf of the defendants and poor timing on the part of the [S]tate in which the Trooper, through absolutely no fault of his own, was stuck with a K–9 officer that he called for at 11:02, who apparently got lost, and said he couldn't find the Trooper, who was clearly visible on the side of the road, but apparently on the opposite side of the six—or eight—lane highway from where the K–9 officer was looking for him.

"And you had that, plus the fact that his home barracks in College Park had its computer down. And clearly until the second call that the Trooper made, he could not be certain whether it was the entire NCIC [or] MILES system and its connection to the state police or whether it was only the local computers at College Park, which it turned out to be.

"He was directed at College Park to call either Frederick or Rockville—Forestville or Rockville, which might have made sense if you're sitting in College Park and you know

---

12. Once Sergeant Hughes returned to the College Park barrack he removed the masking tape from the two packages and weighed them. The total weight of the two packages was 2,124.4 grams. Five samples were taken from each package, each sample weighing approximately one gram, and sent to the chemist for analysis. Petitioner stated in his brief that: "The parties stipulated that the chemist, if called as a witness, would have testified that the substance contained in the samples 'was in fact cocaine.' "

that College Park is halfway between those two locations, but, in fact, the Trooper was on I–95 in the northbound lanes at or near the intersection with the Route 198 cut—off, and he knew that from the 198 exit, the Waterloo barracks is only a couple of miles down the road, whereas Rockville was 20 miles away.

"Learn your geography and you'll know the answer to that. I happen to know that, having driven it many times. And I think there is an old case from Judge Chasanow that says I'm allowed to take judicial notice of local geography. Because apparently you all don't know how to figure those things out. But anyway, that's the reality.

"Forestville was probably much farther than Rockville. Rockville was certainly much farther than Waterloo, which was the next barracks closer to College Park. What the Trooper didn't anticipate was that making that call for the records check was going to hit at the same time that apparently the Waterloo barracks was inundated either with an inefficient dispatcher or somebody who was inundated with a lot of calls coming in at just that particular time.

"So he was waiting in good faith for the records check to come back. I believe that I was wrong, and while I could appreciate your not wanting to correct me, but I frankly didn't remember what the finding was in [*Wilkes*],[13] and the [*Wilkes*] case clearly says that a K–9 sniffing on the exterior of a vehicle or even a suitcase does not create any Fourth Amendment issue whatsoever because the K–9 does not intrude into anything, and we saw that plainly on the video.

"So the length of time that it happened to take for both the K–9 and the records check were almost exactly and precisely concurrent. The records check, I believe, call came back while the dog was wandering around the vehicle, if I recall. If not, it was within a minute or so of the dog arriving and going around the vehicle. I observed the dog.

---

13. *Wilkes v. State,* 364 Md. 554, 774 A.2d 420 (2001).

I saw him stop twice, sniffing where it appeared to me that the defendant was seated on the passenger side of the vehicle.

"Again, as I said earlier, you can't tell on a two—dimensional video what the distance is from the rear of the vehicle to the passenger door, but that was the area in which I saw him kind of sniff a little bit and then get pulled away by the handler to move on and go around the vehicle again. But he did that on each of the first two circuits and it was only on the third circuit that he came around and actually sat. But he was sitting on the same side of the vehicle that he had sniffed before. So I couldn't tell whether he was sniffing at the front passenger door or right behind that or closer to the rear of the vehicle on the side of the trunk by the rear door.

"Clearly, the officers who reported believed that the dog was indicating at the rear of the passenger compartment. They checked there to no avail. I watched the video and you could see the Trooper actually reach deep into the trunk to pull some piece of luggage, or whatever it was, to the front of the trunk in order to then search it. So whether it was in that area just above the wheel well, which would have been approximately where the dog was indicating, is really something for conjecture because I don't think that video is going to get any clearer no matter how many times you watch it.

"So you're going to have to wait for that, for the testimony of the handler as to where he was indicating. But I'm satisfied that there was enough at that indication to become then probable cause for a full search of the vehicle, passenger compartment and trunk.

"Now, as to the delay, I find no impermissible delay because it was absolutely not a pretext for the officer to be waiting for a call back to confirm whether or not there were outstanding warrants or any illegality in the licensing of the driver. While it appears at first blush that because he was able to very quickly clear up any confusion by the registration plate obscuring date—or month and year, he cleared

that up, apparently, very quickly with the driver's license and registration card, but at the time that he was able to look at that, he was also calling in the information for outstanding warrant and criminal record check, which is routine procedure.

"The delay was caused through no fault of the officer. It was not a pretext. Granted he did try and do some more investigative work while talking pre—arrest with the defendant Malone, but all that established was some inconsistencies in what she had told him that raised his suspicions. In fact, he had already requested K–9 assistance. So those reasonable suspicions certainly didn't go to his effort to get a K–9 officer out there because he had already made that decision. So I find those to be irrelevant to this finding.

"But I don't see anything other than due diligence in the officer's part in making the stop."

The hearings judge declined to suppress the evidence of the cocaine as a violation of petitioner's Fourth Amendment or Article 26 protections against illegal search and seizure. At trial, the Circuit Court for Prince George's County convicted petitioner.

On appeal, the Court of Special Appeals affirmed the motions judge and the Circuit Court's decision, finding that "the purpose for the stop had not been accomplished before the K–9 Unit arrived" and that:

"The initial stop was not concluded and, therefore, no additional reasonable suspicion was needed to support continued detention of the vehicle, beyond that which supported the initial stop for violation of the traffic laws. By the time the record check information was finally relayed to the officer, revealing that [petitioner] had an extensive criminal background, the K–9 dog had already signaled that there were drugs in the vehicle, and the officers then validly searched it. *See, e.g., Wallace v. State,* 142 Md.App. 673, 686, 791 A.2d 968 (2002) (probable cause exists to search a vehicle once a drug dog alerts the officers to the potential presence of drugs in it). The detention lasted only long enough to complete procedures incident to the traffic stop."

*Byndloss v. State*, 162 Md.App. 286, 314–15, 873 A.2d 1233, 1250–51 (2005). We agree with this holding—that under the factual circumstances present in this particular case, the initial stop was not concluded and the "detention lasted only long enough to complete procedures incident to the traffic stop."

## II. Standard of Review

Our review of the Circuit Court's denial of petitioner's motion to suppress is ordinarily limited to the record of the suppression hearing, and not the record of the trial. *Whiting v. State*, 389 Md. 334, 345, 885 A.2d 785, 791 (2005); *State v. Nieves*, 383 Md. 573, 581, 861 A.2d 62, 67 (2004); *Laney v. State*, 379 Md. 522, 533, 842 A.2d 773, 779 (2004); *Dashiell v. State*, 374 Md. 85, 93, 821 A.2d 372, 376 (2003) (quoting *State v. Collins*, 367 Md. 700, 706–08, 790 A.2d 660, 663–64 (2002)) (citing *Ferris v. State*, 355 Md. 356, 368, 735 A.2d 491, 497 (1999)). We review the facts and evidence in the light most favorable to the prevailing party on the motion, in the case *sub judice*, the State. *Whiting*, 389 Md. at 345, 885 A.2d at 791; *Nieves*, 383 Md. at 581, 861 A.2d at 67; *Laney*, 379 Md. at 533, 842 A.2d at 779; *Dashiell*, 374 Md. at 93, 821 A.2d at 376–77 (quoting *Collins*, 367 Md. at 707, 790 A.2d at 664) (citing *Riddick v. State*, 319 Md. 180, 183, 571 A.2d 1239, 1240 (1990)). We extend great deference to the hearing judge's fact finding and will not disturb the findings unless clearly erroneous, however, we review independently the application of the law to those facts to determine if the evidence at issue was obtained in violation of the law and, accordingly, should be suppressed. *Whiting*, 389 Md. at 345, 885 A.2d at 791; *Nieves*, 383 Md. at 581–82, 861 A.2d at 67; *Laney*, 379 Md. at 533–34, 842 A.2d at 779–80; *Dashiell*, 374 Md. at 93–94, 821 A.2d at 377 (citing *Lancaster v. State*, 86 Md.App. 74, 95, 585 A.2d 274, 284 (1991)); *State v. Rucker*, 374 Md. 199, 207, 821 A.2d 439, 444 (2003).

## III. Discussion

Petitioner contends that the Court of Special Appeals erred in holding that the motions court properly denied his motion

to suppress the evidence of the cocaine recovered from Ms. Malone's vehicle. Specifically, he argues that his detention by Sergeant Hughes while the trooper was waiting for information from MILES and NCIC amounted to an improper extended amount of time of detention in violation of his Fourth Amendment rights. Petitioner posits that the traffic stop was longer than necessary to effectuate the purpose of the stop, i.e., the warning for the plastic license plate cover.[14] The State argues that Sergeant Hughes reasonably detained petitioner while awaiting the results of a routine license and warrant check on Ms. Malone.[15]

### Extended Length of the Traffic Stop

The case *sub judice* tests what is a reasonable extension of the length of a traffic stop in order for police to receive radio

---

14. Petitioner also contends that there was no articulable suspicion of illegal activity to justify an extended detention, i.e., a "second" stop. We shall not address this issue, as we find that the purpose of the initial stop was not completed prior to the search by the K–9 unit, discussed *infra*.

15. While under the circumstances, i.e., on a trip from Florida to New York, sitting in a vehicle alongside a major interstate highway with the officer in possession of his license, it was extremely unlikely that any such passenger would attempt to leave the scene; nonetheless, the record does not indicate that the officer had ordered the petitioner not to leave. His "detention" (if that is what it was) was incidental to the driver's detention. We are holding that the extent of the detention was not violative of petitioner's rights. No issue is raised as to the standing of the passenger to object to the driver's detention at a traffic stop. Therefore, it is not necessary to resolve the question of whether a passenger has a right to object to the length of the detention of a driver which is based on the driver's traffic violation, as it is not before us.

In the case *sub judice* there is no evidence in the record that petitioner attempted to resist the "detention," as there was in *Dennis v. State*, 345 Md. 649, 693 A.2d 1150 (1997) (*Dennis II*), cert. denied, 522 U.S. 928, 118 S.Ct. 329, 139 L.Ed.2d 255 (1997). The Court in *Dennis II*, addressed the issue presented in *Dennis v. State*, 342 Md. 196, 674 A.2d 928 (1996) (*Dennis I*), vacated, 519 U.S. 802, 117 S.Ct. 40, 136 L.Ed.2d 4 (1996), "whether a passenger in a vehicle whose driver has been stopped by police for a traffic violation may be convicted of disorderly conduct and battery when, rather than heeding the police command to remain in the vehicle, he walks away from the scene, and subsequently resists police attempts at detention." *Dennis I*, 342 Md. at 198, 674 A.2d at 929. Based on the stop being for the officer's

verification of the validity of an individual's driver's license, vehicle registration, and warrants check. It is petitioner's contention that the length of the detention of the driver, and thus himself, in the case at bar was unreasonable and therefore the K–9 search was a violation of his constitutional rights. We find that under the particular facts and circumstances of this case, the initial traffic stop was still ongoing at the time of the K–9 scan and resultant alert. The facts indicate that Sergeant Hughes exercised reasonable diligence under the circumstances, in obtaining the license, registration, and warrant information from MILES and NCIC and there was no evidence extant that the stop was extended beyond the time necessary to reasonably complete all of the actions associated with resolving the initial purpose of the stop.

 The Fourth Amendment to the United States Constitution provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." [16]

The Fourth Amendment protects against *unreasonable* searches and seizures. *See Whren v. United States,* 517 U.S.

---

safety, rather than a *Terry v. Ohio,* 392 U.S. 1, 19, 88 S.Ct. 1868, 1878, 20 L.Ed.2d 889 (1968) investigative stop, the Court reaffirmed its finding in *Dennis I* that "to justify detaining the passenger, the officer must have a reasonable suspicion that the passenger engaged in criminal behavior and must have intended to conduct further investigation based on that suspicion." 342 Md. at 211–12, 674 A.2d at 935.

The only question before us is petitioner's challenge to the length of the detention which resulted from the license and registration check of the documents. Because petitioner sat in the car and did not attempt to walk away, the issue of his actual detention in the first instance is not before us; we are limited to the issue of the length of the stop.

**16.** The Fourth Amendment applies to the States through the Fourteenth Amendment to the United States Constitution. *See Mapp v. Ohio,* 367

806, 809–10, 116 S.Ct. 1769, 1772, 135 L.Ed.2d 89 (1996); *United States v. Mendenhall,* 446 U.S. 544, 550–51, 100 S.Ct. 1870, 1875, 64 L.Ed.2d 497, *reh'g denied,* 448 U.S. 908, 100 S.Ct. 3051, 65 L.Ed.2d 1138 (1980). It is evident that the stopping of a vehicle and the detention of its occupants is a seizure and thus implicates the Fourth Amendment. *See Whren,* 517 U.S. at 809–10, 116 S.Ct. at 1772, 135 L.Ed.2d 89; *United States v. Sharpe,* 470 U.S. 675, 682, 105 S.Ct. 1568, 1573, 84 L.Ed.2d 605 (1985). "An automobile stop is thus subject to the constitutional imperative that it not be 'unreasonable' under the circumstances. As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren,* 517 U.S. at 810, 116 S.Ct. at 1772, 135 L.Ed.2d 89 (citing *Delaware v. Prouse,* 440 U.S. 648, 653, 99 S.Ct. 1391, 1395, 59 L.Ed.2d 660 (1979); *Pennsylvania v. Mimms,* 434 U.S. 106, 109, 98 S.Ct. 330, 332, 54 L.Ed.2d 331 (1977) (*per curiam*)). However, the detention of a person "must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983) (plurality opinion).

We stated in *Wilkes v. State,* 364 Md. 554, 774 A.2d 420 (2001):

"In determining whether there has been a violation of the Fourth Amendment right against unreasonable searches and seizures, the Supreme Court has stated:

The touchstone of our analysis under the Fourth Amendment is always 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.' *Terry v. Ohio,* 392 U.S. 1, 19, 88 S.Ct. 1868, 1878, 20 L.Ed.2d 889 (1968). Reasonableness, of course, depends 'on a balance between the public interest and the individual's right to personal security

U.S. 643, 655, 81 S.Ct. 1684, 1691, 6 L.Ed.2d 1081, 1090 (1961); *Dashiell,* 374 Md. at 94, 821 A.2d at 377.

free from arbitrary interference by law officers.' *United States v. Brignoni–Ponce,* 422 U.S. 873, 878, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975).

*Pennsylvania v. Mimms,* 434 U.S. 106, 108–09, 98 S.Ct. 330, 332, 54 L.Ed.2d 331 (1977); *see also Ohio v. Robinette,* 519 U.S. 33, 39, 117 S.Ct. 417, 421, 136 L.Ed.2d 347 (1996); *Stokes [v. State],* 362 Md. [407,] 412–13 n. 7, 765 A.2d [612,] 615 n. 7 [(2001)]."

*Wilkes,* 364 Md. at 571, 774 A.2d at 430.

 It is undisputed that Sergeant Hughes had probable cause to stop Ms. Malone's vehicle and that there was a valid initial traffic stop. Pursuant to § 13–411 of the Transportation Article, Sergeant Hughes conducted a lawful stop of Ms. Malone's green Chevrolet Malibu, in which petitioner was the front seat passenger, after observing that the car's license plate was obscured by a plastic license plate cover. Petitioner does not challenge the stop itself[17] or even the *Carroll*[18] search of the vehicle made after the K–9 alerted to the

---

17. Petitioner stated in his brief, "[i]n light of *Whren,* [petitioner] does not challenge the initial stop of the vehicle for displaying a registration plate cover which, according to the testimony of Sgt. Hughes, obscured the registration plate when the sun hit it."

18. When officers have probable cause to believe that a vehicle contains contraband, they are not required under the Fourth Amendment to obtain a warrant before searching the car and seizing the contraband. *See Carroll v. United States,* 267 U.S. 132, 150–51, 45 S.Ct. 280, 69 L.Ed. 543 (1925); *Florida v. White,* 526 U.S. 559, 559, 119 S.Ct. 1555, 1557, 143 L.Ed.2d 748 (1999); *Nathan v. State,* 370 Md. 648, 665–66, 805 A.2d 1086, 1096–97 (2002). The K–9 alert provided probable cause for the search. *See Wilkes v. State,* 364 Md. 554, 774 A.2d 420 (2001).

Once the police have probable cause to search a lawfully stopped vehicle they may conduct a warrantless search of any container found inside that may contain the contraband. *See Wyoming v. Houghton,* 526 U.S. 295, 307, 119 S.Ct. 1297, 1304, 143 L.Ed.2d 408 (1999) (holding "that police officers with probable cause to search a car may inspect passengers' belongings found in the car that are capable of concealing the object of the search"); *California v. Acevedo,* 500 U.S. 565, 579–80, 111 S.Ct. 1982, 1991, 114 L.Ed.2d 619 (1991) ("police may search without a warrant if their search is supported by probable cause"); *United States v. Ross,* 456 U.S. 798, 825, 102 S.Ct. 2157, 2173, 72 L.Ed.2d 572 (1982) ("If probable cause justifies the search of a

presence of narcotics.[19] Petitioner argues that "the constitutional violation was the unreasonably prolonged detention or seizure of [petitioner], a passenger in a car that was stopped because a registration plate cover was displayed on the vehicle's rear tag." Petitioner contends that the cocaine recovered from the vehicle was "the fruit[ ] of the unlawful detention" and therefore must be suppressed. *See Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Petitioner's argument boils down to two points: (1) Ms. Malone and petitioner were detained longer than necessary for the issuance of a warning or citation for having the plastic license plate cover and (2) the continued detention was not justified by the circumstances that took place over the "brief period of time that it *should have taken* to determine the status of the driver, passenger and vehicle." We find that Ms. Malone and petitioner were not detained longer than necessary under the circumstances present in the case *sub judice.*

---

lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search."); *but see State v. Wallace,* 372 Md. 137, 159–60, 812 A.2d 291, 304–05 (2002), *cert. denied,* 540 U.S. 1140, 124 S.Ct. 1036, 157 L.Ed.2d 951 (2004) ("A canine alert on the exterior of a vehicle does not support the proposition that the drugs potentially in the car are concealed on a *particular* occupant of that vehicle. When the police get all of the occupants out of the vehicle and find no drugs in the vehicle, they cannot use a positive general canine scan of the car as authority to go further and search a non-owner/non-driver passenger.").

19. Officers do not need to have articulable suspicion in order to conduct a K–9 "sniff" because it is not a search within the scope of the Fourth Amendment. *See United States v. Place,* 462 U.S. 696, 707, 103 S.Ct. 2637, 2644–45, 77 L.Ed.2d 110 (1983) (a dog sniff of luggage does not constitute a "search" under the Fourth Amendment); *City of Indianapolis v. Edmond,* 531 U.S. 32, 40, 121 S.Ct. 447, 453, 148 L.Ed.2d 333 (2000); *Fitzgerald v. State,* 384 Md. 484, 864 A.2d 1006 (2004) (holding that a canine sniff of an apartment's exterior is a "nonsearch" under the Fourth Amendment); *State v. Wallace,* 372 Md. 137, 156 n. 6, 812 A.2d 291, 302 n. 6 (2002) ("a canine sniff, in and of itself, is not a search for purposes of the Fourth Amendment"); *Wilkes,* 364 Md. at 580–82, 774 A.2d at 435–37; *Gadson v. State,* 341 Md. 1, 8 n. 4, 668 A.2d 22, 26 n. 4 (1995), *cert. denied,* 517 U.S. 1203, 116 S.Ct. 1704, 134 L.Ed.2d 803 (1996) ("A dog sniff of a vehicle conducted during a lawful detention is not a 'search' within the meaning of the Fourth Amendment.").

 Because petitioner does not dispute the legitimacy of the stop, we find that the initial seizure was justified and turn to address whether the traffic stop was "longer than is necessary to effectuate the purpose of the stop." *See Royer,* 460 U.S. at 500, 103 S.Ct. at 1325, 75 L.Ed.2d 229. In our determination of whether petitioner's Fourth Amendment rights have been violated, we must first establish when the initial legitimate stop ends. As we discussed in *State v. Green,* 375 Md. 595, 826 A.2d 486 (2003):

> "Judge Raker, speaking for this Court, has drawn a bright line, demarcating the point at which an ordinary traffic stop ends:
>
>> In sum, the officer's purpose in an ordinary traffic stop is to enforce the laws of the roadway, and ordinarily to investigate the manner of driving with the intent to issue a citation or warning. Once the purpose of that stop has been fulfilled, the continued detention of the car and the occupants amounts to a second detention. *See Royer,* 460 U.S. at 500, 103 S.Ct. at 1325–26. Thus, once the underlying basis for the initial traffic stop has concluded, a police-driver encounter which implicates the Fourth Amendment is constitutionally permissible only if either (1) the driver consents to the continuing intrusion or (2) the officer has, at a minimum, a reasonable, articulable suspicion that criminal activity is afoot. *United States v. Sandoval,* 29 F.3d 537, 540 (10th Cir.1994).
>
> 355 Md. at 372, 735 A.2d at 499. This language clarifies that, after a traffic citation or warning has been issued, the Fourth Amendment allows only (1) consensual encounters between the police officer and driver, and (2) detentions supported by, at least, reasonable articulable suspicion."

*Green,* 375 Md. at 610, 826 A.2d at 495. In the case *sub judice,* the initial justified detention was not concluded at the time the K–9 dog alerted to the presence of narcotics in the car. Due to the systems being down at the College Park barrack and then the delayed response of the Waterloo barrack, Sergeant Hughes had not been able to obtain information to verify the validity of the licenses, Ms. Malone's

registration, or conduct a warrant check on Ms. Malone or petitioner. The initial purpose of the stop had not been fulfilled. Therefore, petitioner's only available argument is that the length of the detention was not reasonable, and that the resulting search of the vehicle should be found to be a violation of his Fourth Amendment rights.

Petitioner "acknowledges that the length of a traffic stop, per se, is not dispositive of whether the traffic stop was unreasonable, but it is a factor to consider with all of the other circumstances." As we have discussed previously in *Wilkes:*

"The Supreme Court has expressly rejected imposing rigid time limitations on traffic stops. *See* [*United States v.*] *Sharpe,* 470 U.S. [675,] 685, 105 S.Ct. [1568,] 1575, 84 L.Ed.2d 605 [(1985)]. In that case, the Supreme Court noted that as '[m]uch as a "bright-line" rule would be desirable, in evaluating whether an investigative detention is unreasonable, common sense and ordinary human experience must govern over rigid criteria.' *Id.* The Supreme Court continued:

In assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant. A court making this assessment should take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second-guessing. A creative judge engaged in *post hoc* evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished. But '[t]he fact that the protection of the public might, in the abstract, have been accomplished by "less intrusive" means does not, itself, render the search unreasonable.' The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it.

*Id.* at 686–87, 105 S.Ct. at 1575–76, 84 L.Ed.2d 605 (citations omitted)."

*Wilkes,* 364 Md. at 576–77, 774 A.2d at 433. We will not simply determine that a stop was unreasonable due to the length of time over which it occurred. Based on *Sharpe,* it is necessary to revisit the facts, as expounded upon *supra,* in order to determine whether Sergeant Hughes "diligently pursued" the retrieval of the license, registration, and warrant information from MILES and NCIC.

On November 19, 2003, at 10:58 a.m. Sergeant Hughes pulled the vehicle over. At this time Sergeant Hughes called in the stop to the College Park barrack and was notified that the MILES and NCIC information systems were down but was not given an indication of when they would be back up. At 10:59 a.m. he approached the vehicle, notified the driver, Ms. Malone, of the infraction, spoke with her for a few minutes and obtained her driver's license and registration for the vehicle as well as the passenger's (petitioner) driver's license. At 11:02 a.m. Sergeant Hughes returned to his patrol vehicle, called for a K–9 handler, examined the documents and wrote out a warning for the plastic license plate cover. When he was finished, at 11:08 a.m., he called back the College Park barrack to see if the system was back up. He was informed that it was still down, but that he should contact another barrack because the system failure was limited to College Park. Sergeant Hughes then called the Waterloo barrack, located approximately three miles north of the location of the stop. It was 11:09 a.m. and there was apparently too much background noise or interference for the dispatcher to hear. Sergeant Hughes then, immediately, at 11:10 a.m. used his cell phone to call back the dispatcher. He provided the dispatcher with all of the necessary information to run the check and the dispatcher told him that he would call him back over the air once he received the information. Sergeant Hughes then got out of his vehicle, walked up to Ms. Malone's car and informed her that he was waiting on the results of a license and warrant check.

■ It is at this point in the stop that petitioner argues that the length of the detention has become unreasonable. Petitioner acknowledges that "police may conduct checks of driver's licenses, vehicle registrations and warrant statuses during a traffic stop...." [20] However, petitioner contends that

---

**20.** In *Wilkes* the Court provided an extensive list of case law supporting the reasonableness of conducting such checks:

"Conducting checks of driver's licenses, vehicle registration, and possible warrants is reasonable. *See United States v. Mendez,* 118 F.3d 1426, 1429 (10th Cir.1997) ('An officer conducting a routine traffic stop may run computer checks on the driver's license, the vehicle registration papers, and on whether the driver has any outstanding warrants or the vehicle has been reported stolen. However, once the computer checks confirm that the driver has produced a valid license and proof of entitlement to operate the car, the driver must be permitted to proceed on his way, without further delay by police for additional questioning.') (internal citations omitted); *United States v. McRae,* 81 F.3d 1528, 1535 n. 6 (10th Cir.1996) (noting that an officer conducting a routine traffic stop is authorized to conduct a computer check); *State v. Holman,* 221 Neb. 730, 732–33, 380 N.W.2d 304, 307 (1986) (check of driver's history, registration, and for outstanding warrants is part of the normal procedure for a traffic stop); *State v. Bell,* 382 So.2d 119, 120 (Fla.Dist.App.1980) (police are authorized to determine if there is an outstanding warrant for arrest during stop); *Clark v. State,* 171 Ind.App. 658, 358 N.E.2d 761, 763 (1977) (Police officer's radio call to headquarters to check on any outstanding warrants of defendant was within the scope of the initial investigatory stop).

. . .

"In 1993, the Court of Appeals for the Fifth Circuit considered a similar argument in a case where police questioned a driver and passenger while awaiting the results of a computer check in *United States v. Shabazz,* 993 F.2d 431 (5th Cir.1993). That court stated:
Here, appellants cannot successfully claim that the detention exceeded its original scope. Appellants concede, and we have no doubt, that in a valid traffic stop, an officer can request a driver's license, insurance papers, vehicle registration, run a computer check thereon, and issue a citation. In this case, Officer LaChance asked Shabazz to exit the vehicle and produce his driver's license. He then called in for a computer check of the license. The questioning that took place occurred while the officers were waiting for the results of the computer check. Therefore, the questioning did nothing to extend the duration of the initial, valid seizure. Because the officers were still waiting for the computer check at the time that they received consent to search the car, the detention to that point continued to be supported by the facts that justified its initiation.

"such authority is premised on the fact that this information can be accessed quickly." As the Court in *Wilkes* discussed:

"Such holdings make sense as modern technology has availed police officers with the ability to quickly access relevant information without unnecessarily prolonging the duration of the stop or unreasonably increasing the level of intrusion. *See United States v. Gonzalez,* 763 F.2d 1127, 1130 (10th Cir.1985) ('The police officer had a car radio and contact thereby with dispatchers who had instant access to the National Crime Information Center (NCIC) computer records that could quickly resolve, with reasonable certainty, whether there were warrants outstanding against the driver and whether the car had been reported stolen.')."

*Wilkes,* 364 Md. at 579, 774 A.2d at 435. In the case *sub judice,* petitioner argues that the detention continued beyond a period during which the police would "normally" have received information concerning the driver's licenses, registration, and warrant check.

Sergeant Hughes didn't hear back from either dispatcher until 11:19 a.m. At that time the College Park dispatcher called to inform him that the K–9 handler was lost and could not find the stop location. Sergeant Hughes then called the Waterloo barrack again to see if the license check and warrant information had come back, and was told to "stand by." At 11:23 a.m., tired of waiting for a response, Sergeant Hughes called back the Waterloo barrack using his cell phone and spoke to the duty officer, who told him that they were very busy. At 11:26 a.m. the K–9 handler arrived and proceeded to conduct a scan on Ms. Malone's vehicle. At 11:27 a.m. the Waterloo barrack called Sergeant Hughes back and said that

---

*Id.* at 437 (footnote omitted) (citations omitted); *see also United States v. Crain,* 33 F.3d 480, 485 (5th Cir.1994) ('[W]hen questioning takes place while officers are waiting for the results of a computer check—and therefore does not extend the *duration* of the stop—the questioning does not violate *Terry.*'). Thus, a reasonable continued investigation of the scene, while awaiting the results of a computer check was permissible police procedure under the Fourth Amendment."
*Wilkes,* 364 Md. at 578–80, 774 A.2d at 434–35 (footnote omitted).

petitioner had an extensive criminal background,[21] however, the dispatcher did not provide any outstanding warrant information nor did he provide any information on the driver, Ms. Malone. At 11:30 a.m. the K–9 dog alerted to the presence of narcotics in Ms. Malone's vehicle.

We addressed similar factual circumstances in *Wilkes*. In *Wilkes*, a vehicle was stopped for exceeding the speed limit. While the police were awaiting the results of a records check, a K–9 dog arrived, scanned the vehicle and alerted to the presence of narcotics. We upheld the search. In that case, however, there was no argument that the retrieval of the records check took an unreasonable amount of time. The K–9 unit had arrived within five minutes of the stop. Petitioner draws our attention to a footnote in *Wilkes*, in which we stated:

> "Under the facts of the instant case, the K–9 scan, at the least, occurred while the troopers were waiting for conclusive warrant information, and that period of time, itself, was not unreasonably long. An overly long period of waiting for warrant information may well create problems relating to Fourth Amendment compliance."

364 Md. at 583–84 n. 22, 774 A.2d at 438 n. 22. While it is true that an overly long detention while waiting for warrant information may create Fourth Amendment problems, we do not find the period of detention in the case *sub judice*, based upon the particular facts and circumstances, to be such an occasion. As the Court in *Wilkes* also stated:

> "If the K–9 scan was conducted prior to [the Trooper] receiving any information from the [barrack] concerning the computer check, then, as we have indicated ... the initial purpose for the traffic stop was not yet fulfilled and the K–9 scan was justified without additional independent reasonable articulable suspicion."

---

**21.** For safety reasons this information would be immediately made known to the officer without waiting for the results of the additional requests that were made.

364 Md. at 583, 774 A.2d at 437. It is evident in the case at bar that the K–9 scan was being conducted prior to Sergeant Hughes receiving any information concerning the records check and thus, the initial purpose for the stop was not yet fulfilled.

In *Wilkes,* we discussed *Pryor v. State,* 122 Md.App. 671, 716 A.2d 338, *cert. denied,* 352 Md. 312, 721 A.2d 990 (1998), a case in which a driver was stopped for exceeding the speed limit. The driver was then detained and made to wait for a K–9 unit to arrive. Under the circumstances presented in *Pryor,* the Court of Special Appeals suppressed the evidence obtained from the search, finding that a person stopped for a minor traffic violation "cannot be detained at the scene of the stop longer than it takes—or reasonably should take—to issue a citation for the traffic violation that the motorist committed." 122 Md.App. at 674–75, 716 A.2d at 340. However, as we pointed out in *Wilkes:*

> "that court also recognized that there may be reasons that justify the extension of a traffic stop: '[t]his is not a case in which an extended detention of the motorist could be justified by the need to administer a "field sobriety" test *or by technical difficulties in determining the status of the motorist's license or the ownership of the vehicle that has been stopped.'* "

364 Md. at 575 n. 16, 774 A.2d at 433 n. 16 (citing *Pryor,* 122 Md.App. at 681–82 n. 7, 716 A.2d at 343 n. 7). The extended period of detention in the case *sub judice* was caused by technical difficulties in determining the status of Ms. Malone's and petitioner's driver's licenses, the registration of the vehicle, and warrant checks. There is no evidence that Sergeant Hughes was anything but diligent in his attempts at obtaining that information.

It is established that a records check of a driver's license, registration, and outstanding warrants is an integral part of any traffic stop. *See Prouse,* 440 U.S. at 663, 99 S.Ct. at 1401, 59 L.Ed.2d 660; *Wilkes,* 364 Md. at 578, 774 A.2d at 434. As

Judge Davis, writing for the Court of Special Appeals, expressed in the opinion below:

"It is beyond cavil ... that the law contemplates a record check for outstanding warrants or other infractions as part of the initial stop for the traffic violation. The Court of Appeals has unequivocally confirmed the principle that '[i]t is clear that an officer conducting a routine traffic stop may request a driver's license, vehicle registration, and insurance papers, run a computer check, and issue a citation or warning.' *Nathan* [*v. State*], 370 Md. [648,] 661–62, 805 A.2d 1086, [1094 (2002)]. We have similarly opined that a single detention takes place and a K–9 scan for drugs is constitutionally permissible in situations where the scan is 'at a point in time when the trooper "was still awaiting the results of the license and registration check [and] the scan did not prolong the detention.'" *Graham v. State*, 119 Md.App. 444, 469, 705 A.2d 82[, 94] (1998) (quoting *Munafo* [*v. State*], 105 Md.App. [662,] 671–72, 660 A.2d 1068[, 1072 (1995)]). *See McKoy v. State*, 127 Md.App. 89, 732 A.2d 312 (1999) (after stopping the defendant's vehicle for speeding, the officer obtained the license of the defendant and, before the dispatcher responded to the officer's request for information on the defendant's license and before the citation was written, it was permissible for the K–9 to sniff the vehicle).

In a case factually on point with *Graham*, we opined in *In re Montrail M.*, 87 Md.App. 420, 589 A.2d 1318 (1991), that the officer had reasonable suspicion to detain the vehicle, as it was in an isolated area in the early morning hours. After the officer asked for the driver's license and registration to 'run a check,' the canine unit arrived. *Id.* at 429, 589 A.2d [at 1323]. Before the check was completed, the canine quickly scanned the vehicle and indicated the presence of drugs. We held that 'only one detention occurred,' as the 'trained dog arrived on the scene while [the police officer] was still running a check on [the defendant's] license and registration, and the scan took place as the deputy completed the check.' *Id.* at 437, 589 A.2d [at 1327]. *See Graham,*

119 Md.App. at 458, 705 A.2d 82 (citing *Montrail* with approval for an example of what constitutes a single detention). The initial reason for the traffic stop in this case—a concealed license plate—was still ongoing when the K–9 arrived and conducted the scan of appellant's vehicle. Fortuitously, the computer check had not been completed in spite of the fact that Trooper First Class Butler and the K–9 Unit were delayed because the Trooper was unable to find the location of the traffic stop."

*Byndloss*, 162 Md.App. at 307–08, 873 A.2d at 1246.

While there may in the future be an occasion that arises in which the length of a detention caused by systems being down violates an individual's Fourth Amendment or Article 26 rights, this is not such a case.

The proper method for analyzing the detention, i.e., the diligent pursuit of the investigation, was espoused in *Sharpe* as discussed *supra* by this Court in *Wilkes*. Petitioner argues that Sergeant Hughes "should have determined whether the College Park barrack was the only system experiencing the problem," and suggests that "he should have contacted another barrack immediately upon returning to his car the first time at 11:02 a.m." Furthermore, petitioner argues that Sergeant Hughes "waited too long to get a response from [the Waterloo] barrack before trying another barrack," that "[h]e could have called the Rockville or Forrestville barrack." We, however, find that Sergeant Hughes was sufficiently diligent in his pursuit of the records check. He knew that the College Park barrack's system was down when he first made the stop, but not how long it would be down or whether the problem was systemic, affecting the other barracks. He made his second call to College Park within a reasonable time period to see if the system was back up. At that point he was informed that he should call another barrack, which he immediately did. The Waterloo barrack informed him that they would call him with the information. When they didn't get back to him quickly, he called them back on two different occasions. These efforts on the part of Sergeant Hughes indicate reason-

able diligence in obtaining the records check (as the motions judge, Circuit Court, and Court of Special Appeals found).

## IV. Conclusion

We find that, under the particular facts and circumstances present in the case *sub judice,* the initial stop by Sergeant Hughes was not concluded at the time the K–9 dog alerted to the presence of narcotics. Sergeant Hughes with sufficient diligence pursued the acquisition of the records check involving the validity of Ms. Malone's driver's license and registration, petitioner's driver's license, as well as warrant checks on both individuals. We find that the seizure or detention was reasonable under the circumstances. Therefore, there was no violation of petitioner's Fourth Amendment or Article 26 rights. We affirm the Court of Special Appeals finding that the detention lasted only long enough to complete procedures incident to the traffic stop.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY THE PETITIONER.**

BELL, C.J., files a dissenting opinion, in which GREENE, J., joins.

Dissenting Opinion by BELL, Chief Judge which GREENE, J., joins.

Respectfully, we dissent.

The majority acknowledges, as we believe it must, that the period of time that the driver, Ms. Malone, and petitioner, Orlando Byndloss, as passenger, were detained was an extended period of time. The majority characterizes the central issue in the case as "whether the extended length of time that the driver and passenger were detained while the officer retrieved the information improperly extended the traffic stop beyond what is considered reasonable under the Fourth Amendment of the United States Constitution or Article 26 of the Maryland Declaration of Rights." 391 Md. 462, 465, 893 A.2d 1119,

1123 (2006) (footnote omitted). After analyzing the nature of the stop, however, and the officer's diligence, as the majority does, we are led to a contrary conclusion; namely, that the lack of reasonable suspicion and the officer's lack of diligence resulted in an unreasonable detainment of the petitioner.

A law enforcement officer's objective in a routine traffic stop is to enforce the laws of the roadway and, ordinarily, to investigate the manner of driving with the intent to issue a citation or warning. Our Court's view is crystallized in *Ferris v. State*, 355 Md. 356, 369, 735 A.2d 491, 497–98 (1999), in which Judge Raker summarized several Supreme Court holdings concerning the Fourth Amendment as it relates to traffic stops:

"[A] traffic stop involving a motorist is a detention which implicates the Fourth Amendment. *See United States v. Sharpe*, 470 U.S. 675, 682, 105 S.Ct. 1568, 1573, 84 L.Ed.2d 605 (1985); *Berkemer v. McCarty*, 468 U.S. 420, 439, 104 S.Ct. 3138, 3150, 82 L.Ed.2d 317 (1984) (analogizing the degree of intrusiveness of the usual traffic stop to the degree of restraint imposed by the typical *Terry* stop).... [O]rdinarily such a stop does not initially violate the federal Constitution if the police have probable cause to believe that the driver has committed a traffic violation. *Whren v. United States*, 517 U.S. 806, 810, 116 S.Ct. 1769, 1772, 135 L.Ed.2d 89 (1996). Nonetheless, ... it [is] clear that the detention of a person 'must be temporary and last no longer than is necessary to effectuate the purpose of the stop.' *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983) (plurality opinion)."

Once the purpose of that stop has been fulfilled, the continued detention of the car and the occupants amounts to a second detention. *See Royer*, 460 U.S. at 500, 103 S.Ct. at 1325–26, 75 L.Ed.2d at 238. Thus, once the underlying basis for the initial traffic stop has concluded, a police-driver encounter which implicates the Fourth Amendment is constitutionally permissible only if either (1) the driver consents to the continuing intrusion or (2) the officer has, at a minimum, a

reasonable, articulable suspicion that criminal activity is afoot. *See United States v. Sandoval,* 29 F.3d 537, 540 (10th Cir. 1994). Many other courts around the country, in addressing traffic stops under similar circumstances, have held that a continued detention, absent independent justification, constitutes an illegal seizure under the Fourth Amendment. In *Ferris,* for example, we acknowledged the observations of the Supreme Court of Colorado:

"When, as here, the purpose for which the investigatory stop was instituted has been accomplished and no other reasonable suspicion exists to support further investigation, there is no justification for continued detention and interrogation of citizens. *People v. Redinger,* 906 P.2d 81, 85–86 (1995) *(en banc)* (footnote omitted). *See United States v. Soto–Cervantes,* 138 F.3d 1319, 1322 (10th Cir.1998), *cert. denied,* 525 U.S. 853,525 U.S. 853, 119 S.Ct. 131, 142 L.Ed.2d 106 (1998); *Karnes v. Skrutski,* 62 F.3d 485, 491 (3rd Cir.1995); *United States v. Ramos,* 42 F.3d 1160, 1163 (8th Cir.1994); *United States v. Obasa,* 15 F.3d 603, 607 (6th Cir.1994); *People v. Rodriguez,* 945 P.2d 1351, 1360 (Colo. 1997) *(en banc); Commonwealth v. Torres,* 424 Mass. 153, 674 N.E.2d 638, 642 (1997). *See also Berkemer,* 468 U.S. at 439, 104 S.Ct. at 3150 ('[U]nless the detainee's answers provide the officer with probable cause to arrest him, he must then be released') (footnotes omitted); *Davis v. State,* 947 S.W.2d 240, 243 (Tex.Crim.App.1997) *(en banc)* ('[O]nce the reason for the stop has been satisfied, the stop may not be used as a "fishing expedition for unrelated criminal activity.' ") (quoting *Ohio v. Robinette,* 519 U.S. 33, 40, 117 S.Ct. 417, 422, 136 L.Ed.2d 347 (1996) *(Robinette II)* (Ginsburg, J., concurring))."

*Ferris,* 355 Md. at 372–73, 735 A.2d at 499–500. Moreover, we acknowledged that:

"Many of these cases employing careful scrutiny if not skepticism over continued detentions in the context of traffic stops are consistent with the admonition of *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) and its progeny that a *Terry* stop must not only be justified at its

inception, but its scope throughout must be reasonably related to the circumstances which justify the intrusion. *United States v. Babwah*, 972 F.2d 30, 33 (2nd Cir.1992)." *Id.* at 373, 735 A.2d at 500.

We glean from the case law that a detention or seizure becomes unreasonable if an individual is detained longer than it should reasonably take to check on a driver's license, registration, or other investigative information. Further, it is important to note, as the Court of Special Appeals illustrated in *Carter v. State*, 143 Md.App. 670, 692–93, 795 A.2d 790, 803 (2002), that

> "[o]nce a reasonable time for the processing of a traffic charge has expired, even a minimal further delay to accommodate the arrival of a drug-sniffing canine is not permitted. *Graham v. State*, 119 Md.App. 444, 469, 705 A.2d 82 (1998). That foreclosure is for the obvious reason that the dog sniff, however valuable it might be for other investigative purposes, does not in any way serve the purpose of ... justifying [the initial] traffic stop. Once the purpose of the traffic stop has been fully and reasonably served, no further detention is permitted—unless, in the course of the traffic stop, some independent articulable or reasonable suspicion has arisen to create some new and self-sufficient investigative purpose."

In this context, it is, thus, imperative to keep in focus the sequence of events that transpired in the case *sub judice* after Sergeant Hughes stopped the vehicle operated by Ms. Malone:

10:59 a.m. Sergeant Hughes approaches the vehicle after the stop. The reason for the stop was that a plastic cover over the license plate obscured the tag. The driver, Ms. Malone, according to the officer, seemed nervous and restless. Ms. Malone volunteered to remove the plastic cover, however, the Sergeant told her that removing the cover on Interstate 95 would be too dangerous.

11:02 After retrieving both Ms. Malone's driver's license and registration; and the petitioner's driver's license, Sergeant Hughes went back to his vehicle. He told the

other officer on the scene, "I'm going to talk to them a little more, she is real nervous." He called and requested a K–9 unit after the initial contact with Ms. Malone and Mr. Byndloss, when he knew the College Park Barracks ("CPB") computer system was down. More importantly, Sergeant Hughes wrote a warning for the tag violation but did not give it to Ms. Malone.

11:08 Sergeant Hughes then called the CPB. The CPB told him that the system was down and advised him that the Rockville or Forestville Barrack's systems were up and running.

11:09 Sergeant Hughes called the Waterloo Barracks [1] because it was geographically closer to the traffic stop than both the Rockville or Forestville Barracks, but the Waterloo dispatcher could not hear him due to background noise and interference during the transmission.

11:10 Sergeant Hughes called the Waterloo Barracks from his cell phone, and provided Ms. Malone's and Mr. Byndloss's information and asked for license and outstanding warrant checks on both individuals. As he waited for a reply from the Waterloo Barracks, he exited his vehicle, approached Ms. Malone's vehicle and told her to get out of the car and come to the rear of the vehicle. He told her that the system was slow and asked her questions about where she was traveling, how long she was staying at her destination and about her luggage. He noticed that she had been crying, was jumpy and her stories were inconsistent. Because the weather was windy and cold, Ms. Malone told the officer that she was cold. The Sergeant returned to his patrol car, leaving Ms. Malone standing alongside Interstate 95.

11:19–11:20 The CPB called and told the officer that the K–9 unit could not find the location of the traffic stop.

---

1. Maryland State Police Waterloo Barracks is located on Route 1 (Washington Blvd.), in Jessup, Howard County, Maryland. Malone's vehicle was stopped south of Route 198 on Interstate 95 in Prince George's County.

Again Sergeant Hughes called the Waterloo Barracks and was told to "stand by." Sergeant Hughes noticed that Ms. Malone was still outside and asked her if she would like to sit in his vehicle.[2] He asked her if there was any contraband in her vehicle. She said no, she did not think there was contraband in the vehicle.

11:23 Sergeant Hughes, using his cell phone, called the Waterloo Barracks again and was informed that they were busy and would get back to him.

11:26 The K–9 unit arrived.

11:27 The Waterloo Barracks called and informed the Sergeant that the Mr. Byndloss had an extensive criminal record.

11:30–11:40 The K–9 made a hit on the vehicle for drugs. A search was conducted, in which drugs were found in the trunk, in a suitcase containing men's clothing.

Having made a valid traffic stop based on the tag violation, the Sergeant, within ten minutes had conducted the necessary investigation, obtained the requisite information, addressed the matter with the driver, and made the determination that a warning ticket should be issued. Sergeant Hughes could not complete a license and registration check because the computers at his barracks were down. It is worth noting that there is no requirement that a trooper must complete a record check when the computer is down. At this point, absent some reasonable articulable suspicion, the stop should have ended.

According to Sergeant Hughes, however, his observation that Ms. Malone appeared "nervous" and "restless" made him "suspicious." Although he requested and obtained both Ms. Malone's and Mr. Byndloss's identification,[3] Ms. Malone's de-

---

2. Curiously, from approximately 11:10 a.m.–11:20 a.m., Sergeant Hughes apparently left Ms. Malone standing outside on the shoulder of Interstate 95. He had told her minutes earlier that he did not think it was a good idea for her to remove the plastic cover from her license plate, because it was too dangerous on Interstate 95 due to traffic.

3. It is unclear why the petitioner's license was being checked and, unfortunately, the record provided no clarity on the subject, and the issue was not raised by the petitioner. Petitioner's sole issue was:

meanor apparently made such an impact on the Sergeant that he not only told the accompanying officer that he was "going to talk to them a little more, she is real nervous," but his "suspicion" also led him to call the K–9 unit first, before running a check on the driver's and passenger's identification.

Previously, we have held that if a person is nervous when pulled over by a police officer, that behavior does not rise to the level of reasonable suspicion:

"[N]ervousness ... of the driver pulled over by a Maryland State trooper is not sufficient to form the basis of police suspicion.... There is no earthly way that a police officer can distinguish the nervousness of an ordinary citizen under such circumstances from the nervousness of a criminal who traffics in narcotics. An individual's physiological reaction to a proposed intrusion into his or her privacy cannot establish probable cause or even grounds to suspect. Permitting citizen's nervousness to be the basis for a finding of probable cause would confer upon the police a degree of discretion not grounded in police expertise, and, moreover, would be totally insusceptible to judicial review."

*Ferris*, 355 Md. at 388, 735 A.2d at 508 (quoting *Whitehead v. State*, 116 Md.App. 497, 505, 698 A.2d 1115, 1119 (1997)).

Moreover, in *Ferris*, this Court cautioned against "placing too much reliance upon a suspect's nervousness when analyzing a determination of reasonable suspicion." *Id.* at 389, 735

---

"During a routine traffic stop, may a State trooper withhold the issuance of a written warning and continue to detain the occupants of a vehicle after the driver and passenger have both provided driver's licenses and registration for the vehicle and the trooper has written a warning for the traffic infraction, but he has not issued it to the driver because the computer system, through which record[s] are checked, is inoperable, preventing the trooper from confirming the validity of the licenses and registration and checking for outstanding warrants?" Sergeant Hughes testified that he employed, "aggressive, proactive traffic enforcement" techniques when looking for traffic violators. *See Byndloss v. State*, 162 Md.App. 286, 291, 873 A.2d 1233, 1236 (2005). In light of that testimony, a matter of concern for us, was that the first information provided to the Sergeant, in response to the record check, involved the passenger, Mr. Byndloss's extensive criminal history instead of either his or Ms. Malone's driving history.

A.2d at 509 (citations omitted). Noting that characterizing an individual as nervous, even unusually so, "is an extremely subjective evaluation," *id.* at 389, 735 A.2d at 508 (citing *United States v. Fernandez,* 18 F.3d 874, 879 (10th Cir.1994)), in which an officer who has had no prior interaction with the person whose behavior is being characterized, "could not reasonably gauge [the person's] behavior during the traffic stop with his usual demeanor." *Id.* (citing *United States v. Beck,* 140 F.3d 1129, 1139 (8th Cir.1998)).

In evaluating the scope of this traffic stop, we are mindful that a police officer's actions during a traffic stop must be reasonably related to the purpose of the stop. An officer must have reasonable suspicion to temporarily detain a driver, and the nervousness of the driver, under Fourth Amendment analysis, does not constitute reasonable suspicion. Furthermore, absent valid consent, a reasonable suspicion of other unlawful activity, or a reasonable suspicion that a detainee is armed and dangerous, an officer may not expand an investigative detention beyond the scope of the stop or embark on a "fishing expedition" in hope that something will turn up. In the case *sub judice,* the officer not only lacked suspicion, but his actions unreasonably expanded the scope of the stop in time and manner.

In *Wilkes* we referred to the Supreme Court's decision in *Sharpe* which stated that the length of time upon which a traffic stop is measured is not a rigid one. *See Wilkes v. State,* 364 Md. 554, 576–77, 774 A.2d 420, 433 (2001) (citing *Sharpe,* 470 U.S. at 685, 105 S.Ct. at 1575, 84 L.Ed.2d at 615). Furthermore, there is no bright line test for reasonableness with respect to detentions following a traffic stop. *Sharpe,* 470 U.S. at 685, 105 S.Ct. at 1575, 84 L.Ed.2d at 615. Nonetheless, in *Sharpe,* the standard was that

"[a] court making this assessment should take care to consider whether the police are acting in a swiftly developing situation and in such cases the court should not indulge in unrealistic second-guessing. The question is not simply whether some other alternative was available, but whether

the police acted unreasonably in failing to recognize or to pursue it."

*Sharpe,* 470 U.S. at 686–87, 105 S.Ct. at 1575–76, 84 L.Ed.2d at 616 (citations omitted).

This Court pointed out that modern technology allows for quick access to information without unnecessarily prolonging the duration of the stop, to cut down on the level of intrusion. *Wilkes,* 364 Md. at 579, 774 A.2d at 435 (citing *U.S. v. Gonzalez,* 763 F.2d 1127, 1130 (10th Cir.1985)).

Further,

"[i]n assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant."

*Sharpe,* 470 U.S. at 686, 105 S.Ct. at 1575, 84 L.Ed.2d at 615.

What was not discussed in *Wilkes* was the police officer's reasonable use of modern technology in such a manner so as to avoid prolonged roadside detentions. The majority, however, relies primarily upon *Wilkes* in resolving this case. The facts in *Wilkes* are inapposite. The K–9 unit in *Wilkes* arrived on the scene within five minutes after the stop. Here, the K–9 unit arrived approximately thirty minutes after the stop, while it took thirty minutes to verify information concerning the driver's license, registration, and warrant information. Thirty minutes is too long to verify information using computer technology, especially considering that other reasonable alternatives were available. Sergeant Hughes could have contacted either the Rockville or Forestville Barracks or, in the alternative, issued the warning he had written earlier and allowed the driver and the passenger to leave the scene.

When Sergeant Hughes failed to proceed diligently under the circumstances, the prolonged detention became unreasonable. *See Lee v. Cline,* 149 Md.App. 38, 56, 814 A.2d 86, 96–97 (2002), *rev'd on other grounds,* 384 Md. 245, 863 A.2d 297 (2004); *Pryor v. State,* 122 Md.App. 671, 674–75, 716 A.2d 338,

340 (1998) (holding "that, unless continued detention can be justified by what occurs during the brief period of time ... [a] motorist who is subjected to a '*Whren* stop' for a minor traffic violation cannot be detained at the scene of the stop longer than it takes—*or reasonably should take*—to issue a citation .... ") (second emphasis added) (footnote omitted). *See also, Charity v. State,* 132 Md.App. 598, 615, 614, 753 A.2d 556, 565; *cert. denied,* 360 Md. 487, 759 A.2d 231 (2000) (a "legitimate ... traffic stop to justify a coincidental investigation has a finite 'shelf life,' even when the traffic stop ... is not formally terminated" and "the legitimating *raison d'etre* [may] evaporate if its pursuit is unreasonably attenuated or allowed to lapse into a state of suspended animation").

Moreover, in the present case, the State has failed to satisfy its burden of proving that the scope of the stop and detention was reasonable given the length of the detention. The stop extended beyond the time reasonably necessary for Sergeant Hughes to investigate a traffic offense. The articulated reason for the traffic stop was because of the tag violation. Although the driver offered to remove the cover immediately and apparently could have, the officer refused to permit the removal because, in the Sergeant's opinion, it was too dangerous a maneuver alongside Interstate 95. Yet, approximately ten minutes later, from 11:10 a.m.–11:20 a.m., Sergeant Hughes directed Ms. Malone to stand outside her car, which was stopped adjacent to Interstate 95.

In addition, Sergeant Hughes never explained why he did not promptly call either Rockville or Forestville Barracks from his cell phone when the College Park Barracks dispatcher informed him that those computer systems were up and running.[4] The suppression hearing judge stated that Ser-

---

4. The Sergeant failed to exercise due diligence in contacting the Rockville or Forestville Barracks, although several opportunities clearly were presented. He easily could have contacted both or either barracks

 (1) after he became aware that both Rockville and Forestville systems were up and running,

geant Hughes did not call the Rockville or Forestville Barracks because of the distance between where the stop occurred and the location of those two barracks. That assertion is not persuasive after one considers that the matter of checking for information contained in a computer has no correlation to the proximity of the officer to a barrack.[5] The evidence reasonably supports the conclusion that the delay in obtaining confirmation with regard to the driver's license, registration, and warrant information was a direct result of Sergeant Hughes's lack of due diligence. Clearly, delaying the time it took to obtain the license, registration, and warrant information, permitted the arrival and subsequent scan of the vehicle by the K–9 unit, constituting a second stop, unrelated to the tag violation. When Sergeant Hughes became aware that he could not proceed diligently, he should have given Ms. Malone the warning he had written earlier and allowed her to leave.

Unfortunately, in justifying the State's actions, the majority today expands our holding in *Ferris*. In doing so, it overlooks the overarching policy explicated in *Royer* of balancing the individual's right to privacy and the State's legitimate interests. Commentators have acknowledged, in some jurisdictions that, *"Terry* has been whittled away to the point that ... 'routine' traffic stops are commonly turned into drug investi-

---

 (2) after he called the Waterloo Barrack the first time and experienced interference and noise, (but instead he chose to call Waterloo on his personal cell phone),

 (3) after he called Waterloo on his cell phone, either

 (i) immediately, or,

 (ii) after a few minutes; when it should have been apparent to him that an unreasonable amount of time had passed and the traffic stop was no longer a temporary detention, and

 (4) after Waterloo advised him to "stand by."

**5.** We are not swayed by Sergeant Hughes's explanation that the distance between the traffic stop and the Rockville or Forestville Barracks prevented him from contacting them for fear of interference. When the Sergeant experienced interference with the Waterloo Barracks, he "immediately" switched to using his cell phone to diminish background noise. The Sergeant could have used his cell phone to call either the Rockville or Forestville Barracks.

gations through a variety of techniques, including 'questioning about drugs, grilling about the minute details of travel plans, seeking consent for a full roadside exploration of the motorist's car, or parading a drug dog around the vehicle.'" *O'Boyle v. Wyoming,* 117 P.3d 401, 415 (Wyo.2005) (quoting WAYNE R. LaFAVE, 4 SEARCH AND SEIZURE § 9.3(d), 370, (4th ed. 2004) (other citations omitted)). By virtue of the majority's opinion, this Court further whittles away at *Terry* and validates stalling as another technique to turn routine traffic stops into drug investigations, notwithstanding the absence of reasonable suspicion.

The majority maintains that the purpose of the stop had not yet been completed, after all, the Trooper had not been able, by no fault of his own, to complete the license and registration checks. That cannot be the test. The convenience of Maryland's citizens should be taken into account. Under the majority's rationale, a stop for a traffic infraction no more serious than this one, so long as the computer system remains inaccessible, can be extended, to the affected citizen's utter and severe inconvenience, for an unlimited period, as long as it is necessary to check that citizen's license and registration, and the citizen subjected to it would have absolutely no recourse.

It warrants reminding that it is within this Court's province, and indeed, it is this Court's obligation, to make an independent, reflective constitutional judgment of the trial court's factual findings whenever claim of a constitutionally-protected right is involved. Although this Court gives great weight to the findings of the trial judge as to specific, first-level facts (such as the time interrogation began), this Court must make its own independent judgment as to what to make of such facts and must, in making such independent judgment, resolve for itself the ultimate, second-level fact of whether a constitutional violation occurred. *See Ferris,* 355 Md. at 368, 735 A.2d at 497; *see also Walker v. State,* 12 Md.App. 684, 695, 280 A.2d 260 (1971), *Perkins v. State,* 83 Md.App. 341, 346, 574 A.2d 356 (1990).

We do not disagree with the majority as to any of the facts on the record. Our conclusions as to what the trooper could have, and indeed, should have, done are entirely based on the lapses of time established and our belief that the lack of certain facts support an opposite conclusion. Accordingly, based upon our independent evaluation of the evidence to support the extended detention, we are satisfied that evidence seized as a result of the unconstitutional detention should have been suppressed.

Judge GREENE joins in this dissenting opinion.